# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| **v.** | * | **Criminal Case No. TDC-20-033** |
| **PATRIK MATHEWS** | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## DEFENDANT'S REPLY TO GOVERNMENT'S CONSOLIDATED OPPOSITION TO DEFENSE MOTIONS

The defendant writes to reply to certain issues raised in the Government's Consolidated Opposition to Defense Motions (ECF No. 122). Specifically, the defendant replies to the government's analysis of the legality of the CCTV warrant, the Title III warrant, and the government's analysis regarding Mr. Mathews' Motion to Dismiss Counts Nine and Twelve.

1. In support of the CCTV warrant, the government claims, "[i]n part, the CCTV was needed because Mathews intended 'to acquire firearms to conduct attacks and is actively discussing future attacks when physically present with like-minded individuals—just as he is when he is inside' the Delaware Residence." ECF No. 122, at 26 (citing Ex. I, ¶ 117). The government also notes that the "affidavit in support of the December 18th Title III largely mirrors the affidavit in support of the December 11th CCTV Warrant." *Id.* at 29. Given the issues of contention regarding the CCTV and Title III warrants largely overlap, this section will address both warrants.

Page 117 of Exhibit I (Affidavit for CCTV warrant), the affiant claims "[b]ased on my training and experience, knowledge of the investigation, and discussions with the UCE[,]" he believed Mathews intended to acquire the firearms to conduct attacks and is would discuss future

attacks. *Id.* The affiant provides no tangible facts to support these beliefs—probable cause is not satisfied.

The government also claims "the defendants do not explain how statutorily permitted bases for warrants—finding co-conspirators and proving the possession of controlled substances—are legally wrong, other than to make an unsupported moral claim that it is 'highly inappropriate.'" ECF No. 122, at 27.

The defense contends that the government's claims regarding Distribution of Controlled Substances, Inciting a Riot, and Attempt to Commit a Hate Crime were never supported by the affidavits. It appears that the government conceded this issue, focusing their argument on harboring and possession of the firearm, aside from this one point of argument. Authorization of 24-hour CCTV surveillance and 24-hour interception of oral communications within the home is "highly inappropriate" when the controlled substances violation relates to the exchange of a few prescription drug pills. Authority for this statement is grounded in decades of Fourth Amendment law, which provides the most privacy protection against searches within the home. *See, e.g.*, *Kyllo v. United States*, 533 U.S. 27, 31 (2001) ("'At the very core' of the Fourth Amendment 'stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'") (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961). Twenty-four-hour audio and video surveillance within one's home is the most intrusive search possible. Therefore, it is quite clear no court would authorize such an extreme invasion based on the mere exchange of some Adderall pills, which is extremely common. The government's use of this incident to support probable cause for the CCTV warrant was extraneous and should be disregarded.

When you eliminate the frivolous and clearly unsupported offenses from the affidavits,

the key question remains: whether the invasive CCTV and Title III warrants were necessary for the government's investigation into Lemley's harboring of Mathews and who possessed the firearm. The government claims "[a]ccording to the affidavit, the CCTV warrant 'is the only viable means of determining, among other things, the methods in which Base members have transported and harbored MATHEWS, the identities of co-conspirators involved in the harboring of MATHEWS, the presence and distribution of narcotics . . ., and the presence and possession of firearms.'" ECF No. 122, at 26 (quoting Ex. I, ¶ 120).

This entirely failed to explain why 24-hour surveillance inside the home was the *only* means of determining who transported and harbored Mr. Mathews and who possessed the firearm. This is particularly relevant to the CCTV Warrant. While the Title III could possibly reveal statements about who possessed the firearm or who assisted in harboring Mr. Mathews, closed circuit video surveillance is very unlikely to provide such information. While highly intrusive, the CCTV surveillance stood to provide very little assistance in discovering evidence of the crimes stated in the affidavit. At the time the affidavit was written, agents already knew about the existence of the firearm and the fact Mathews was living with Lemley. It is unclear how visual surveillance inside their home would assist agents in determining how Mathews was harbored, who else was involved, or who controlled the firearm, which generally would never be used within the confines of an apartment.

Courts have consistently held that warrants authorizing video surveillance require the highest constitutional standards as constructed under Title III. *See, e.g.*, *United States v. Falls*, 34 F.3d 674 (8th Cir. 1994); *United States v. Koyomejian*, 970 F.2d 536 (9th Cir.), cert. denied, 113 S. Ct. 617 (1992); *United States v. Mesa-Rincon*, 911 F.2d 1433 (10th Cir. 1990); *United States v. Cuevas-Sanchez*, 821 F.2d 248 (5th Cir. 1987). Courts have also consistently found that the

sanctity of the home is most protected by the Fourth Amendment. *See e.g.*, *Kyllo*, 533 U.S. at 31.

For these reasons, the CCTV affidavit failed to meet the threshold for necessity because visual surveillance of the inside of Mr. Lemley's apartment was unlikely to reveal how Mathews was transported or who would transport him in the future or who possessed the firearm. Given, agents already had set up surveillance outside of the apartment and location monitoring of Lemley and Mathews' phones, they had a much more effective method of pursuing these answers already in place and CCTV surveillance was unnecessary and unlikely to help the investigation.

The Title III warrant failed to meet the threshold for necessity on similar grounds. The government acknowledged that it already knew Mathews and Lemley were in possession of a firearm and Lemley had harbored Mathews. ECF No. 122, at 27. The government reasons that the CCTV and Title III would help reveal if Lemley took other actions to transport Mathews to other residences, which had happened in the past.

This type of reasoning does not resolve necessity or exhaustion because it failed to address why this extreme level of surveillance was needed to resolve issues of investigation that were better suited for traditional methods of investigation, which were already in place. The government already had teams monitoring the outside of the apartment and following Mr. Mathews and Mr. Lemley to work every day and watching them at all times. The government also had location tracking on Lemley and Mathews' phones. Therefore, if Mr. Lemley were to attempt to transport Mr. Mathews somewhere else, the government had a perfect means of tracking such a transport. Similarly, when Mr. Lemley and Mr. Mathews traveled to the gun range, the government had the perfect means of identifying possession of the firearm. For these reasons, the CCTV and Wiretap surveillance were entirely unnecessary.

The government also characterized the defendant's necessity argument as invalid because traditional means of surveillance required could not discover their intended information immediately. The fact that the defendants had to assemble the gun from a kit before they could use it and the fact that Mr. Lemley did not actually intend to transport Mr. Mathews to another location does not necessitate an extremely invasive search that stood to accomplish very little. If that type of reasoning was accepted, the government could regularly sidestep traditional means of investigation in favor of 24-hour audio and video surveillance within one's home.

In defending necessity of the wiretap, the government stated that the UCE had not yet been in the proximity of the defendants, other than Base training camps and that the "defendants *intentionally left* the Delaware Residence when speaking to the UCE and had never told the UCE the location of the Delaware Residence." ECF No. 122, at 31. This was the analysis from the affidavits, indicating that it would be dangerous for the UCE to enter the defendants'' home and that the defendants were intentionally trying to conceal their location from the UCE. It is important to analyze facts that occurred after the authorization of the CCTV and Wiretap warrants because these facts show that the reasoning for necessity and exhaustion were groundless.

First, the UCE was consistently infiltrating Base training camp events, which indicates that entering the defendants' apartment would not be extremely dangerous or more dangerous than events located in remote areas, where guns are fired by many Base members. Second, the way the UCE was able to enter the defendants' home was extremely simple and unsophisticated. He simply messaged Mr. Lemley asking, "What do you boys look like this Saturday night? I'm gonna be around." *See* 12.31.19 wire messages_Redacted.pdf. Mr. Lemley subsequently invited the UCE over to his home and informed him of his general proximity and subsequently disclosed

his home address. The UCE was able to drive directly to the defendants' home, spent the whole day with the defendants, traveled to the gun range with them, and ate and drank with them.

The UCE also knew the defendants very well from prior communications at Base training camps and over the Wire Chat application. The UCE was adept at extracting information from both of defendants and aware that Mr. Lemley was constantly criticized by other members in the Base chat for disclosing too much information about his background and location. Agents knew that they could have accomplished the objectives described in the Title III application using ordinary investigative techniques and elected to install 24-hour surveillance as a groundless fishing expedition for speculative crimes such as "Inciting a Riot" and "Attempt to Commit a Hate Crime." The facts related to harboring an illegal alien and possession of a firearm by an illegal alien were very limited and the wiretap and CCTV were not needed to uncover evidence of those crimes. Alternatively, the affidavits contained pages and pages of constitutionally protected hate speech to disguise the fact that there was no real meat to the affidavit. The government characterized Mr. Mathews' reliance on "free speech" and *Brandenburg v. Ohio,* 395 U.S. 444 (1960), as a "red herring" noting that the investigation was not "directed at the First Amendment." That characterization misses the point of Mr. Mathews argument with respect to First Amendment protected speech.  Mr. Mathews does not contend that protected speech may not be relevant for certain purposes.  Mr. Mathews argues that under *Brandenburg,* protected hate speech or violent speech that falls short of incitement of violence or imminent harm cannot itself serve as the basis for prosecution. Accordingly, the constitutional limitations on prosecution arising from the exercise of protected speech has been held to apply to federal statues such as the Anti-Riot Act, 18 U.S.C. §210. *See United States v. Daley,* 378 F.Supp.3d 539, 555-557 (Anti-Riot Act not in violation of the principles set forth under *Brandenburg*). It

follows that if the government cannot bring a prosecution for the exercise of free expression of odious hate speech or violent speech that does not reach the level of incitement or imminent harm as set forth in *Brandenburg*, the government cannot seek a warrant unless the speech at issue crosses the *Brandenburg* line and establishes probable cause of actual incitement and imminent harm. It is clear from the affidavits in support of the CCTV and Title III warrants that the highly intrusive searches were triggered by suspicions arising from Mr. Mathews exercise of his protected First Amendment right to free speech. The warrant affidavits did not come close to establishing probable cause of actual incitement or imminent harm. To allow such warrants to issue based on no more than the exercise of protected speech, no matter how odious, will severely chill the exercise of first amendment rights.

In regards to necessity of the Wiretap and CCTV surveillance, the UCE's trip to the defendants' home, albeit weeks after the authorization of the warrant, nevertheless shows that the agent could have just as easily messaged Mr. Lemley in this manner weeks earlier. *C.f., United States v. Wilson*, 484 F.3d 267, 281 (4th Cir. 2007) ("Congress has placed a burden on the Government to show the 'necessity' of any wiretap application via a full and complete statement as to whether 'normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous.'") (quoting 18 U.S.C.A § 2518(3)). It was unreasonable to employ conclusory statements in the CCTV and Wiretap affidavits, indicating that it was too dangerous or difficult to get an agent into the apartment when it later proved to be so simple and easy, without any change in circumstances or explanation why it was so simple weeks later, but could not have been attempted, prior to the authorization of the CCTV and Title III  warrants. The government skipped the step of exhausting simple, ordinary, and easy investigative methods and jumped to the most intrusive

techniques, and therefore the CCTV and Title III searches should be suppressed.

The government also mischaracterized the defendant's argument in regards to exhaustion. The point of the exhaustion is to ensure the government does not jump to a highly intrusive method of surveillance without first explaining why normal investigative procedures "reasonably appear to be unlikely to succeed if tried or [are] too dangerous." *United States v. Barahona*, 606 F. App'x 51, 58 (4th Cir. 2015) (quoting 18 U.S.C. § 2518(3)). The reason the defense mentioned facts that occurred after the authorization of the CCTV and Title III warrants intended to show how easily agents could have accomplished the goals of the investigation if they had simply attempted far less invasive techniques, rather than first electing to implement highly intrusive 24-hour monitoring of the defendants' home.

Additionally, *Leon* does not save the warrants' deficiencies in regard to necessity and exhaustion. First, a circuit split exists as to whether *Leon's* good faith exception applies to Title III warrants. *Compare United States v. Rice*, 478 F.3d 704, 713 (6th Cir. 2007) (holding that *Leon's* good faith exception does not apply to Title III warrants); *United States v. Malekzadeh*, 855 F.2d 1492, 1497 (11th Cir.1988) (same) *with United States v. Moore*, 41 F.3d 370, 376 (8th Cir.1994) (finding that *Leon*'s good faith exception does apply to Title III warrants); *United States v. Brunson*, 968 F.3d 325, 333 (4th Cir. 2020) (holding that *Leon's* good faith doctrine applied to a wiretap order).

Although *Brunson* is precedent in this Court, the actual defect in the *Brunson* warrant was "fail[ing] to include the name of the official authorizing the application." 968 F.3d at 329. *Brunson* did not address issues like necessity and exhaustion, which are unique substantive requirements for a Title III warrant, specifically tailored to balance the extreme invasiveness of a wiretap, which are not required in other search and seizure warrants. In the current case, the

affiant simply concluded it would be too difficult or dangerous to get the UCE into the defendant's home when it was clearly quite easy to acquire the defendants' home address and the visit was far less dangerous than the UCE's many visits to Base training camps. Therefore, a reasonable officer might not be able to rely on the warrant in good faith, knowing they never met the necessity or exhaustion requirements.

Additionally, it is not clear that *Brunson*'s holding should apply to the entire scope of Title III, given the narrow issue of the missing official's name in *Brunson*. Mr. Brunson also petitioned for certiorari on October 29, 2020 and this matter is still pending.


2. The government claims Mr. Mathews "Motion to Dismiss Counts Nine and Twelve (multiplicity) Should be Denied." ECF No. 122, at 36. Tacking on a § 924(b) violation to the defendant's § 922(g)(5) alien in possession charge contravenes the purpose of § 924(b), which intended to punish the intended use of the firearm in a future criminal act.

Section A addresses statutory intent and shows that § 924(b) is never utilized to double punish possession, in the manner attempted by the government in this case. Section B explains why prosecution under § 924(b) cannot be sustained under *Blockburger* and *Wilson* because the act of transport relates to the jurisdictional interstate commerce element under § 924(b), which merges into the interstate commerce element under § 922(g)(5), as interpreted by courts. Section C explains why the elements of § 924(b) cannot be met in this case because transport automatically requires current/prior possession of the firearm, and therefore the defendant could not transport (which requires current possession) with intent to gain possession in the future. Section D explains why prosecution under § 924(b) cannot be sustained for the intended felony of disposal of a firearm to an illegal alien under § 922(d)(5) because Mr. Mathews cannot be

charged with the disposal of a firearm to an illegal alien because he cannot dispose of the firearm to himself.

### A. 18 U.S.C. § 924(b) Was Not Intended to Double Punish an Alien in Possession of a Firearm Under 18 U.S.C. § 922(g)(5).

The government defines the elements of § 924(b) as: "the defendant: a) transported a firearm in interstate or foreign commerce; b) with the intent to commit a crime with the weapon, have actual knowledge that a crime will be committed with the weapon, or have reasonable cause to believe that a crime will be committed with the weapon; and c) the underlying crime is punishable by a term exceeding one year." ECF No. 122, at 35 (citing *In re Coleman*, 473 F. Supp. 2d 713, 718-19 (N.D. W. Va. 2007).

This definition of § 924(b), provided by the government, lays out three potential scenarios for element (b): each scenario *requires* the intended crime to be committed *with the weapon*. This provides insight into statutory intent as well as how courts have interpreted § 924(b) as intending to punish the use of a dangerous weapon to break the law or cause harm with that firearm. *See* Pub. L. No. 90-351, § 924(b), 82 Stat. 197, 233 (1968) (using "therewith" in reference to the firearm, indicating that the drafters intended the 924(b) penalty to punish crimes in which the firearm was actively used in the crime's commission); *see, e.g.*, *In re Coleman*, 473 F. Supp. 2d at 716 (transporting the firearm with the intent to commit murder using the firearm); *United States v. Holmes*, 975 F.2d 275, 283 (6th Cir. 1992) ("Section 924(b) applies to anyone who carries a firearm in interstate commerce "with intent to commit" a felony.").

Charging Mr. Mathews under § 924(b), supported by § 922(g)(5) contravenes the purpose of § 924(b), which intended to punish defendants who possess a firearm and intend to use it in an unlawful manner. The way Mr. Mathews' § 924(b) count is structured punishes the defendant twice for obtaining possession of the firearm and intending to possess the same firearm, which is

10

covered under § 922(g)(5).

Among thousands of federal cases that discuss § 922(g), very few involve § 924(b)

penalties and none of those utilize the 922(g) violation as the necessary criminal intent to satisfy

924(b). *See*, *e.g.*, *United States v. Cardenas*, 864 F.2d 1528, 1530 (10th Cir. 1989) (an example

of an extremely rare case involving 922(g)(5) and 924(b) violations, but the intent of crime to

satisfy 924(b) was intent to use the firearm in furtherance of a drug trafficking crime, rather than

intent to possess as an illegal alien).

Additionally, in *United States v. Hassan*, a defendant was charged with violating 18

U.S.C. § 924(b), as well as knowingly selling firearms and ammunition to a felon under §

922(g)(1). 742 F.3d 104, 111 (4th Cir. 2014). Yet, the 924(b)-violation attached to Counts One

and Two for conspiracy to commit murder, kidnapping, and maiming with the weapon under 18

U.S.C. § 956(a) and providing material support to the § 956(a) offense in violation of 18 U.S.C.

§ 2339A. *Id.* In *Hassan*, the § 922(g)(1) count was not attached to the 924(b) claim, despite the

defendant's intent to sell the firearm and ammunition to a felon because this is not how 924(b)

was intended to be applied and it practically never shows up in such a manner.

**B. The Government's Comparison of *Wilson* to the Current Case is Incorrect and Imposing Double Penalties on Mr. Mathews Under 18. U.S.C. 922(g)(5) and § 924(b) Violates Mr. Mathews Fifth Amendment Protection Against Double Jeopardy.**

The government analyzed *Wilson*, stating: "the act of illegally exporting and importing a

firearm, whether in interstate or foreign commerce, by definition requires transporting the

firearm. A violation of § 2778 automatically proves a violation of § 924(b). For this reason, the

court found that Congress 'did not intend § 2778 and § 924(b) offenses to be punished more

severely in combination than either could be punished separately . . .'" ECF No. 122, at 37.  The

*Wilson* court concluded: "[w]e believe that Congress did not intend § 2778 and § 924(b) offenses

to be punished more severely in combination than either could be punished separately, absent any additional proof of wrongdoing. Indeed, imposing sentences under both statutes would violate the appellant's Fifth Amendment protection against double jeopardy." *United States v. Wilson*, 721 F.2d 967, 970 (4th Cir. 1983).

The government's emphasis on transport when defining 18 U.S.C. § 924(b) excluded key language from the statute which read: "ships, transports, or receives a firearm or any ammunition in interstate or foreign commerce  . . . ." 18 U.S.C. § 924(b). In the current case, a similar question to *Wilson* arises as to whether the  § 922(g)(5)) act "to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce" can occur without requiring the defendant "ships, transports, or receives a firearm or any ammunition in interstate or foreign commerce[,]" under 18 U.S.C. § 924(b). The "shipping, transport, or receiving of a firearm requirement under § 924(b) is functionally equivalent to "the firearm or ammunition must have traveled in or affected commerce" element from § 922(g)(5). *C.f. Wilson,* 721 F.2d at 971 (finding that "export under § 2778 and transport in foreign commerce under § 924(b) are *practical equivalents*[,]" indicating identical language is not required) (emphasis added).

While it may be inferred that § 924(b)'s exclusion of the phrase "in or affecting commerce" creates a heightened standard, that question has not been resolved by the Fourth Circuit, allowing functionally equivalent interstate commerce interpretations. Accordingly, Mr. Mathews cannot come into possession of a firearm in interstate commerce in violation of  § 922(g)(5) without also receiving the firearm in interstate commerce in violation of § 924(b). In *Wilson*, the intent was to export, which essentially transports the firearm to someone else. In the

12

current case, the intent was possession as an illegal alien, which requires the same incorporated

action of receiving the firearm in interstate commerce—exact language stated in both § 922(g)(5)

and § 924(b). Categorically, there is little difference.

The ambiguity among courts on the strictness of interstate commerce under § 924(b),

coupled with a lack of cases where § 922(g) violations are used to support § 924 intent, indicates

§ 924(b) was never intended to be utilized in this manner and Mr. Mathews is effectively being

doubled punished for his § 922(g)(5) offense. There is no authority indicating that the interstate

commerce element under 922(g)(5) and 924(b) are interpreted differently. *Compare United*

*States v. Havelock*, 560 F. Supp. 2d 828 (D. Ariz. 2008) (finding that receipt of a firearm that

was entirely intrastate in nature did not satisfy a heightened standard under 924(b)) *with Rodgers*

*v. United States,* No. 11-CR-117 (KMW), 2020 WL 3099967, at *4 (S.D.N.Y. June 11, 2020)

(applying no precedential value to *Havelock* and stating that the precise contours of the conduct

to suffice under 924(b)'s interstate commerce requirement was undefined); *see also United*

*States v. Chastain*, No. 19-2627, 2020 WL 6304702, at *3 (8th Cir. Oct. 28, 2020) (rejecting

*Havelock* in favor of a broad interpretation of § 924(b)'s interstate commerce element noting,

"[a]n out-of-circuit district court decision recognizing multiple rational readings of § 924(b) and

adopting the one most favorable to the criminal defendant is a far cry from showing Chastain's

argument is 'clear under current law.'"); *see also, United States v. Trevino*, 720 F.2d 395, 397

(5th Cir. 1983) (satisfying the interstate commerce element of § 924(b) by "receiving firearms

that had traveled in interstate commerce" via the ordinary course of interstate commerce). Even

under *Havelock*, the court only distinguished 924(b) to the extent that purely intrastate receipt of

firearms did not meet the 924(b) threshold.

Therefore, under any standard, when Patrik Mathews first received the firearm, he gained

possession of the firearm, violating both 922(g)(5) and 924(b) simultaneously, through the single action of having received a firearm in the course of interstate commerce. *C.f. Blockburger v. United States*, 284 U.S. 299, 304 (1932) ("where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.").

### C. Regardless of Blockburger, the Elements of Counts 9 and 12 Under § 924(b) Against Mr. Mathews Were Not Satisfied Because Mr. Mathews Already Possessed the Firearm at the Time of Transport.

Constructive possession of a firearm is defined as exercising dominion and control over or having "the power and the intention to exercise dominion and control over the firearm."). *United States v. Scott*, 424 F.3d 431, 435–36 (4th Cir. 2005). By definition, Mr. Mathews would have exercised dominion and control over the firearm prior to its transport. The elements of constructive possession were clearly satisfied, prior to transport. Accordingly, the transport did not occur with the intent to commit the *future* crime of being an illegal alien in possession of a firearm. The possession necessarily occurred *prior* to transport and would have continued thereafter.

Additionally, § 922 violations intended to punish different categories of prohibited persons for shipping, transporting or receiving firearms. *See U.S. v. Laurent*, 861 F.Supp.2d 71, 86-87 (2011) (detailing the statutory intent behind 922(n), noting the same language applies under 922(g), and concluding that receiving or transporting a firearm inherently requires possession). Mr. Mathews could not transport the firearm with the intent to dispose of it to himself or aid Lemley in disposing it to him because Mr. Mathews first had to possess the firearm to transport it. Thus, Mr. Mathews could not violate § 924(b) by transporting the firearm

with the future intent to possess it as an illegal alien because possession as an illegal alien was previously established the moment Mr. Mathews received the firearm and was automatically established, prior to taking the act of transporting the firearm (which required possession).

In opposition, the government theorized, "[p]resumably, a jury could find that Mathews is guilty of Count 9 – that he aided/abetted transport of the gun intending to possess it, because Count 9 allows for that future intent, without necessitating that the jury also find him guilty of Count 8 – intentional and illegal possession knowing he was forbidden. Because the jury could find him guilty of one and not the other, this demonstrates that these are separate crimes separately and appropriately charged." ECF No. 122, at 36-37.

The government's theory fails because Mr. Mathews constructively possessed the firearm, prior to transporting it, and therefore the second element of the § 924(b) offense cannot be satisfied. Whether the intended crime is phrased as a § 922(d)(5) offense or § 922(g)(5), it equates to Mr. Mathews' intent to gain possession of the firearm in the future as the only criminal act that satisfies the element of intent to commit a crime punishable by over one year's imprisonment. Mr. Mathews prior possession of the firearm eliminates the possibility of a future intent to dispose of the firearm to himself or aid and abet Mr. Lemley's disposal to Mathews.

Mr. Mathews was the illegal alien and he already possessed the firearm and therefore the intent element of § 924(b) cannot be satisfied.

**D.  The 18 U.S.C. § 924(b) Counts are Defective with Respect to the Intended Felony of Disposing of a Firearm to an Illegal Alien, under 18 U.S.C. § 922(d)(5).**

Mr. Mathews claims that Counts 9 and 12 of indictment, which charge violations of 18 U.S.C. § 924(b), are defective to the extent they are based on the intended felony of disposing of a firearm to an illegal alien, in violation of 18 U.S.C. § 922(d)(5) because Mr. Mathews could not be charged with the intended offenses. An illegal alien cannot be charged with an offense to

dispose of the firearm to himself. The government apparently agrees with this legal conclusion because co-defendant Lemley, alone, is charged with the offense in the indictment in Counts 7 and 10. In response to Mr. Mathews claim the § 924(b) counts are defective for this reason, the government simply states the indictment can allege both intended felonies - disposing of a firearm to an illegal alien, in violation of  18 U.S.C. § 922(d)(5) and illegal alien in possession of a firearm, in violation of 18 U.S.C. § 922(g)(5) - in the conjunctive and the government is not required to prove both intended felonies to obtain a conviction under § 924(b). Mr. Mathews does not argue that the indictment cannot be pled in the conjunctive. However, Mr. Mathews contends that if this Court finds that Counts 9 and 12 are not properly brought with respect to the intended felony of illegal alien in possession of a firearm, § 922(g)(5), the § 924(b) counts must be dismissed because the intended felony of disposing of a firearm to an illegal alien, § 922(d)(5), cannot be prosecuted either.

Accordingly, Mr. Mathews requests that this Honorable Court grant his pretrial motions.

Respectfully submitted,

/S/

JOSEPH A. BALTER           #04496
Law Office of Joseph A. Balter, LLC
Mt. Washington Mill
1340 Smith Avenue, Ste 200
Baltimore, Maryland 21201
Telephone:  (410) 375-7082
Facsimile:   (410) 779-1201
Email:        joseph@josephbalterlaw.com