**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | |
| | * | Criminal No. TDC-20-33 |
| BRIAN MARK LEMLEY, JR., | * | |
| PATRIK JORDAN MATHEWS, and | * | |
| WILLIAM GARFIELD BILBROUGH | * | |
| IV | * | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**BRIAN MARK LEMLEY'S REPLY
TO GOVERNMENT'S OPPOSITION TO MOTION TO SUPPRESS**

Defendant Brian Mark Lemley, Jr. moved to suppress evidence seized pursuant to several search warrants which permitted law enforcement to collect a wide range of private information about the defendants and ultimately allowed agents to enter a private residence, install audio and video monitoring equipment, and commence real-time monitoring of all activities within that residence. In his opening brief, Mr. Lemley demonstrated that the affidavits submitted in support of those warrant applications did not establish probable cause with respect to any of the listed offenses, that the applications seeking permission to perform video and audio monitoring within the residence did not establish necessity for those highly intrusive investigatory techniques, and that the applications relied upon evidence obtained illegally during earlier warrant searches. The *Leon* good faith exception does not save any of the warrants. The government's opposition brief fails to effectively rebut any of these arguments. The defense motion should be granted in full.

1

I.      **The Search Warrants for Mr. Lemley's Cell Phone, Email Accounts, and Apartment Were Unsupported by Probable Cause**

A.      **September 5, 2019 Warrant Application**

The government contends Agent Harrison's September 5, 2019 affidavit established probable cause as to the three "target offenses" identified in his warrant application: inciting a riot, under 18 U.S.C. § 2101, conspiracy or attempt to commit a hate crime, under 18 U.S.C. § 249, and distribution of a controlled substance, under 21 U.S.C. § 841.  ECF No. 110 at 16-20.  The government's arguments are unpersuasive.

1.      **Inciting a Riot**

The government notes that Agent Harrison's affidavit asserted: (1) "[t]he Base 'has proclaimed war against minority communities'"; (2) the Base and Mr. Lemley "used encrypted chat rooms and online platforms . . . to discuss committing acts of violence"; (3) Base members attended training camps outside of Maryland; and (4) the Base's founder, Rinaldo Nazzaro, "gave instructions and encouragement" to its members.  ECF No. 122 at 19-20.  Even if true, however, these allegations do nothing to establish that Mr. Lemley (or anyone else) traveled across state lines or used the facilities of interstate commerce with the intent to incite or participate in a "riot," i.e., a "public disturbance" involving actual or threatened "acts of violence" that constituted "a clear and present danger," as required by the Anti-Riot Act.  *See* ECF No. 122 at 17.  Nowhere in the affidavit are there any statements attributed to Mr. Lemley suggesting an intent to engage in acts of violence.  The government's position appears to be that because Base members *talked about* or *thought about* committing acts of violence, there was probable cause to search Mr. Lemley's phone.  But even if the affidavit established that Mr. Lemley himself discussed violence – which it does not – the Anti-Riot Act does not criminalize discussing or considering the possibility of violence.  It prohibits only "overt acts" that present "a clear and present danger" of

2

"damage or injury to the property of any other person or to the person of any other individual." 18 U.S.C. §§ 2101(a), 2102(a). Even the allegation that Base members attended "training camps" – the only portion of the affidavit cited by the government that entails actions, and not just words – falls well short of suggesting any such clear and present danger existed.

The government also claims Mr. Lemley "would have the Government prove a criminal violation beyond a reasonable doubt just to get a search warrant." ECF No. 122 at 20. The basis for this claim is unclear, and Mr. Lemley does not propose any such requirement. Instead, he simply asks the Court to apply the well-established rule that "[p]robable cause only exists when an officer has a reasonable belief that a law has been broken," and "[a]n officer cannot have a reasonable belief that a violation of the law occurred when the acts to which an officer points as supporting probable cause are not prohibited by law." *United States v. Williams*, 740 F.3d 308, 312 (4th Cir. 2014). An affiant need not prove a crime has been committed beyond a reasonable doubt, but he must provide *some* basis to believe the conduct described is criminal. And of course, if the acts described in an affidavit do not constitute a violation of a criminal statute, they are not criminal. Because Agent Harrison's affidavit does not point to "overt acts" that pose a "clear and present danger," §§ 2101(a)-02(a), it does not allege conduct that is "prohibited by law," *Williams*, 740 F.3d at 312.

### 2.    Attempt or Conspiracy to Commit a Hate Crime

The government contends the September 5, 2019 affidavit established probable cause to find an attempted violation of § 249 because it alleged that (1) "the motivating factor for the conduct of the defendants and other Base members was racial animus toward minorities," and (2) Mr. Nazzaro "gave encouragement, including 'the system can't be replaced

3

peacefully.'"  ECF No. 122 at 20.  But the government does not even attempt to show how these facts add up to probable cause to believe Mr. Lemley or others attempted to violate § 249.

As Mr. Lemley explained in his motion, ECF No. 110 at 19, an attempt requires a "substantial step" toward the commission of a crime, i.e., "a direct act in a course of conduct planned to culminate in commission of a crime that . . . is more than mere preparation but less . . . than completion of the crime."  *United States v. Engle*, 676 F.3d 405, 423 (4th Cir. 2012).  The fact that Base members harbored "racial animus," or that Mr. Nazzaro gave vague "encouragement" to his members, does not establish probable cause to believe Mr. Lemely (or anyone else) had taken "a direct act" that was "more than mere preparation."  Nor do these facts indicate Mr. Lemley "put[] in motion events that would, from [his] point of view, result in the commission of a crime but for some intervening circumstance."  *United States v. Pratt*, 351 F.3d 131, 135 (4th Cir. 2003).  Thus the affidavit does not allege "acts" that are "prohibited by law."  *Williams*, 740 F.3d at 312.

Agent Harrison's affidavit also fails to establish probable cause to believe Mr. Lemley and others conspired to commit a hate crime.  To prove a conspiracy under 18 U.S.C. § 371, "the government must show an agreement to commit an offense, willing participation by the defendant, and an overt act in furtherance of the conspiracy."  *United States v. McNeal*, 818 F.3d 141, 149 (4th Cir. 2016).  Base members' racist views and Mr. Nazzaro's vague hortatory statements do not demonstrate that Mr. Lemley actually "agree[d] to commit" a violation of § 249, that is, that he in fact agreed to "cause[] bodily injury to any person" because of the victim's race.  Speaking about violence in the abstract is not remotely the same thing as actually agreeing to use violence against another (unspecified) person because

of his (unspecified) race.  And even if the government's facts demonstrated such agreement, there is no allegation that any Base member took an "overt act" in furtherance of that agreement.  *Id.*

### 3.      Distribution of a Controlled Substance

Finally, the government argues Agent Harrison's affidavit demonstrated probable cause to believe Mr. Lemley distributed Adderall, a controlled substance.  ECF No. 122 at 21.  Even assuming the simple act of providing a few Adderall pills to a handful of other people constitutes a violation of § 841, Agent Harrison's affidavit fails to establish a "nexus" between that offense and Mr. Lemley's cell phone.  *United States v. Jones*, 942 F.3d 634, 638 (4th Cir. 2019).  A warrant must establish not just that "the owner of the property [to be searched] is suspected of crime," but also "that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." *United States v. Doyle*, 650 F.3d 460, 471 (4th Cir. 2011).  Here, the government asserts Mr. Lemley's historical cell-site information "would provide evidence of the distribution that was known to have occurred," but it does not explain why that is so.  ECF No. 122 at 21.  Knowing where Mr. Lemley took his phone would not help prove that he distributed Adderall.  Moreover, agents were already aware where Mr. Lemley was when he allegedly provided pills to other Base members because the undercover agent was apparently present when it occurred.

The government also argues historical and prospective cell-site information would provide evidence of "locations and co-conspirators in any distribution activity."  ECF No. 122 at 21.  But nothing in Agent Harrison's affidavit provides any reason whatsoever to believe that (1) Mr. Lemley distributed controlled substances on another occasion, or (2) anyone else conspired with him to distribute such substances.  Thus asking for Mr.

Lemley's cell phone location information was a quintessential "fishing expedition"—seeking evidence in the unjustified hope that it might point to other crimes for which probable cause does not yet exist. *United States v. Gibbs*, 547 F. App'x 174, 179 (4th Cir. 2013) (unpublished).

### B.    October 2, 2019 Warrant Application

The October 2, 2019 warrant application sought (1) 30 days' worth of prospective location information for Mr. Lemley's cell phone, and (2) "location history," from November 13, 2017, through the present, for an email account linked to Mr. Lemley. Ex. B at 31-34. Agent Harrison's affidavit asserts probable cause to believe these data would contain evidence of the three "target offenses" from the September 5th warrant (inciting a riot, attempt or conspiracy to commit a hate crime, and distribution of a controlled substance) as well as "Bringing in and Harboring Certain Aliens," under 8 U.S.C. § 1324. Ex. B at 4-5. The affidavit contains no additional facts relevant to the former two crimes, and, for the reasons described above, the application therefore fails to establish probable cause as to those offenses.

Even if the September 5th application established probable cause to search Mr. Lemley's cell phone data for evidence of drug distribution, the October 2nd application does not. The latter application re-alleges that Mr. Lemley gave Adderall to fellow Base members at a training camp in early August 2019. Ex. B at 19. But it then adds that, pursuant to the September 5th warrant, agents obtained cell records for Mr. Lemley's phone during that time period, which show "no call data." Ex. B at 19. According to the affidavit, this lack of data indicates Mr. Lemley "was cognizant of operational security and either turned his phone off or did not complete any calls for these days." Ex. B at 20. The affidavit further alleges that Mr. Lemley's cell records also indicate "no call data" while he was at another Base training

camp on August 17, 2019.  Ex. B at 20.  This fact, too, allegedly indicates Mr. Lemley "was cognizant of operational security and either turned his phone off or did not complete any calls for these days."  Ex. B at 20.

Thus the affidavit itself makes clear there is no reason to believe Mr. Lemley's cell-site data will reveal evidence of drug distribution.  And if Mr. Lemley turned off his phone while at the training camp, it is unlikely he used his email account during that period, since doing so would create a record of his location—exactly what he (allegedly) sought to avoid doing by powering down his phone.

As for the immigration-related offenses, the government cites various facts supposedly establishing that Mathews entered the United States illegally.  ECF No. 122 at 21-22.  But even assuming this premise is correct, the government does not suggest the affidavit establishes probable cause to believe Mr. Lemley "br[ought] to or attempt[ed] to bring" Mr. Mathews to the United States, as required by § 1324(a)(1)(A)(i).  None of the facts the government identifies – e.g., that Mr. Mathews was a member of the Base or that other Base members "assisted [him] in his border crossing," ECF No. 122 at 21 – indicates Mr. Lemley "physically transport[ed]" Mr. Mathews across the border.  *United States v. Flores-Blanco*, 623 F.3d 912, 920 (9th Cir. 2010).  Nor does the government point to any fact in the October 2nd affidavit that is even minimally probative of an essential element of any § 1324(a)(1)(A)(ii) or § 1324(a)(1)(A)(iii) violation: the offender's "know[ledge] or . . . reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law."  Finally, the government does not dispute that Agent Harrison's affidavit fails to allege any facts indicating that, Mr. Lemley "provide a refuge for [Mr.

Mathews] *because* he's an illegal alien," as needed to state a violation of § 1324(a)(1)(A)(iii). *United States v. Costello*, 666 F.3d 1040, 1045 (7th Cir. 2012) (emphasis in original).

Without these missing facts, Agent Harrison's affidavit does not allege conduct that is "prohibited by law." *Williams*, 740 F.3d at 312.

### C.     October 18, 2019 Warrant Application

On October 18, 2019, Agent Harrison submitted an application for a warrant to search the contents of Mr. Lemley's Google account, including chats and email messages sent and received from November 1, 2017, to the present.  Ex. C at 36-37.  The affidavit asserted probable cause to believe Mr. Lemley's account would contain evidence of the same four "target offenses" listed in the October 2nd application.  Ex. C at 2-3.  In addition to repeating facts contained in previous applications, the October 18th application alleged that: (1) in a September 2019 chat with other Base members, Mr. Lemley "wrote 'Hey mr fed . . . I spent about 35% of my day daydreaming about killing you today'" and "'I day dream about killing so much that I frequently walk in the wront [sic] directions for extended periods of time at work'"; (2) on August 31, 2019, Mr. Lemley drove from Maryland to Indiana, where he remained for two hours before driving to Chincoteague Island, Virginia; and (3) on September 14, 2019, Mr. Lemley drove from Maryland to Georgia with Mr. Mathews.  Ex. C at 20, 25-27.

These facts do nothing to establish probable cause that Mr. Lemley had incited a riot, attempted or conspired to commit a hate crime, distributed a controlled substance, or harbored an alien.  In particular, they do not suggest that Mr. Lemley "physically transport[ed]" Mr. Lemley across the U.S.-Canada border, *Flores-Blanco*, 623 F.3d at 920; that he "provide[d] a refuge for [Mr. Mathews] *because* he's an illegal alien," *Costello*, 666 F.3d at 1045 (emphasis in original); or that Mr. Lemley knew, or recklessly disregarded the

8

fact, that Mr. Mathews had entered the United States illegally, § 1324(a)(1)(A)(ii)- (iii). Thus all evidence seized pursuant to the October 18th warrant must be suppressed.

### D.      October 28, 2019 Warrant Application

On October 28, 2019, FBI Agent Alexandria Thoman swore out a warrant application seeking, among other things, (1) 30 days' worth of prospective location information for Mr. Lemley's phone, and (2) "the contents of all emails associated with" another account allegedly belonging to Mr. Lemley.  Ex. D at 58, 61.  To obtain the latter category of information, the application relied on emails seized pursuant to the October 18th application. *See* Ex. D at 29-30.  Because that latter application failed to establish probable cause as to the "target offenses," as explained above, evidence seized under authority of the October 18th warrant cannot support probable cause in the October 28th application.  *See United States v. DeQuasie*, 373 F.3d 509, 519 (4th Cir. 2004); *United States v. Fall*, 955 F.3d 363, 372 (4th Cir. 2020) (explaining that "if an affidavit supporting a search warrant is based in part on some illegal evidence," warrant is valid "if it is otherwise properly supported" by probable cause that is not "taint[ed]").

In addition, the government does not claim the October 28th application contains any new facts suggesting Mr. Lemley had committed the target offenses.  *See* ECF No. 122 at 17.  The application therefore failed to establish probable cause to believe investigators would find evidence of those crimes in Mr. Lemley's phone or email data, and all evidence seized pursuant to the resultant warrant must be suppressed.

### E.      November 8, 2019 and November 18, 2019 Warrant Applications

On October 8, 2019, FBI Agent Kevin Bodmer submitted an application seeking a warrant to search Mr. Lemley's email account for, among other things, location information and "the contents of all e-mails" and "chat messages" from October 18, 2019, to the present.

Ex. E at 59-60.  It also sought permission to seize "the contents of all emails" from another email account linked to Mr. Lemley.  Ex. E at 66.  The application defined the "target offenses" slightly differently from previous applications: inciting a riot, under § 2101; attempt to commit a hate crime, under § 249; conspiracy to commit the preceding crimes, under § 371; distribution of controlled substances, under § 841; and "Bringing in and Harboring Certain Aliens, and conspiracy to do so," under § 1324.  On November 18th, Agent Harrison sought a warrant for 30 days' worth of prospective location information from Mr. Lemley's cell phone.  Ex. F at 54.  His application listed the same "target offenses" as Agent Bodmer's.  Ex. F at 3.

Neither of these applications contained any new facts indicating that Mr. Lemley had committed the target offenses, or that evidence of those offenses would be found in his phone or email data.  The government notes that the applications alleged "Lemley, Mathews, and Bilbrough travel[ed] to and participat[ed] in a Base training camp in Georgia."  ECF No. 122 at 17.  But this fact does not establish probable cause to believe that Base members were conspiring to incite a riot (i.e., to engage in "overt acts" that present "a clear and present danger" of injury or property damage, §§ 2101(a)- 02(a)); that they had attempted to commit a hate crime; or that anyone other than Mr. Mathews knew he had entered the country illegally.  Thus the November 8th and November 18th warrants are invalid, and all evidence seized under them must be suppressed.

### F.    December 11, 2019 Applications for Sneak-and-Peek and Video Warrants

On  December  11,  2019,  Agent  Harrison  submitted  applications  for  warrants  to (1) install a closed-circuit television in the apartment where Mr. Lemley and Mr. Mathews

were living, and (2) conduct a "sneak-and-peek" search of that apartment.[1]   Those applications listed the same "target offenses" as the November 8th and November 18th applications, but added three new offenses: possession of a firearm by an unlawful alien, under 18 U.S.C. § 922(g)(5); aiding and abetting violations of § 922(g)(5) and § 1324 (the alien-harboring statute); and conspiracy to violate § 922(g)(5).   Ex. G at 2; Ex. H at 2. Contrary to the government's contentions, Agent Harrison's applications failed to establish probable cause as to any target offense.

The government argues "the affidavit described Mathews's intention and plan to acquire firearms specifically in and around December 2019, and Mathews's successful completion of at least part of that plan, his internet searches for 'Build your own AR-15' and other firearm-related items, and his attendance at a Base training camp in late October and early November 2019 in which ammunition and firearms were present."  ECF No. 122 at 22. It is true that the affidavit (1) quotes an undercover FBI agent to whom Mr. Mathews said he hoped and "inten[ded]" to acquire firearms; (2) alleges Mr. Mathews conducted internet searches indicating a desire to obtain guns; and (3) asserts he attended a Base "training camp" in October and November 2019.  Ex. G at 48, 52, 59-60.  But nothing in the affidavit suggests Mr. Mathews had "successful[ly] complet[ed] at least part of [his] plan" to acquire guns. The portions of the affidavit the government cites do not state, or even imply, that Mathews had in fact obtained a firearm.  ECF No. 122 at 22 (citing Ex. G, ¶¶ 85, 95, 110-17).  In fact, Agent Harrison asserted he "believe[d] that MATHEWS *intend[ed]* to acquire firearms"—

---

[1] The defense addresses the affidavit's failure to establish necessity for video surveillance separately below.

not that he had already acquired one. Ex. G at 63 (emphasis added). Absent actual (not just intended) possession of a firearm, there can be no § 922(g)(5) violation.

The government also argues Agent Harrison's affidavit demonstrated probable cause to believe Mr. Mathews knew he was in the United States illegally because "he crossed the U.S. border with Canada on foot, not at a legal point of entry, and that he was transported and harbored at various hidden locations throughout the United States by members of a secretive organization." ECF No. 122 at 23. The affidavit, however, explains that Mr. Mathews, whose apartment the police searched days before he entered the United States, was a fugitive from Canadian authorities. *See* Ex. G at 40-41. Thus the affidavit provides reason to believe he hoped to avoid detection because he was wanted for violations of Canadian law. But it gives no reason to believe he knew he had violated U.S. immigration law when he entered the country.

Finally, the government does not argue the December 11th affidavit contains any facts relevant to other "target offenses" that were not described in previous affidavits. *See* ECF No. 122 at 25. Agent Harrison's December 11th application therefore fails to establish probable cause as to those offenses for the same reasons that previous applications were deficient. All evidence seized pursuant to the December 11th warrants must be suppressed.

### G.     December 13, 2019 Warrant Application

Agent Thoman's December 13, 2019 application sought permission to seize (1) location history and the contents of Mr. Lemley's primary email account from November 8, 2019, to the present, and (2) the contents of all emails associated with another of Mr. Lemley's email accounts, from November 8, 2019, to the present. Ex. I at 69-72, 76-78. The application identified the same "target offenses" as the December 11th applications. Ex. I at 5. In its response, the government does not identify any new facts contained in the December

13th application that support probable cause to believe Mr. Lemley or Mr. Mathews had committed any of those offenses.  The warrants issued pursuant to that application are therefore invalid, and all their fruits must be suppressed.

###### H.      December 18, 2019 Wiretap Application

On December 18, 2019, an assistant U.S. attorney in Delaware submitted an application to wiretap Mr. Lemley's and Mr. Mathews' apartment, listing the same "target offenses" that were in the December 13th warrant application.[2]  As Mr. Lemley explained in his motion, the wiretap application relied extensively on information obtained during the sneak-and-peak search of the apartment days earlier.  ECF No. 110 at 30-31.  Because those facts were uncovered pursuant to an invalid warrant, they cannot contribute to probable cause.  *See DeQuasie*, 373 F.3d at 519; *Fall*, 955 F.3d at 372.  And the government does not dispute that without those additional facts, the wiretap application fails to establish probable cause as to the "target offenses."   Evidence recovered through the wiretap should be suppressed.

###### I.      January 14, 2020 Warrant Application

Finally, FBI Agent Kristopher Long submitted an application on January 14, 2020, seeking a warrant to search the Delaware apartment and Mr. Lemley's car.  The application asserted probable cause to believe those locations contained evidence of a host of new "target offenses."  Ex. K at 2-3.  The government does not dispute that the supposed probable cause as to those offenses rested on evidence obtained pursuant to the video and wiretap warrants. *See* ECF No. 110 at 13.  Because those warrants were invalid, evidence seized under authority

---

[2] The defense addresses the affidavit's failure to establish necessity for audio surveillance within the apartment separately below.

of the January 14th warrant must be suppressed, too.  *See DeQuasie*, 373 F.3d at 519; *Fall*, 955 F.3d at 372.

## II.   The December 11, 2019 and December 18, 2019 Search Warrant Affidavits Did Not Establish Necessity for Video and Audio Surveillance Within the Delaware Apartment

The intrusiveness of the investigative methods employed by law enforcement in this case cannot be overstated.   On December 13, 2019 agents entered Mr. Lemley's apartment surreptitiously, searched the entire apartment, and installed hidden audio and video recording equipment which permitted government agents to watch and listen to everything Mr. Lemley and Mr. Mathews did behind the closed doors of their private residence.  Agents monitored all activity within the apartment for almost a full month.  It is widely recognized that the surveillance techniques employed here involved a very serious invasion of privacy.  *See, e.g.*, *United States v. Cuevas–Sanchez,* 821 F.2d 248, 251 (5th Cir. 1987) (covert video surveillance is a severe intrusion into a person's privacy expectations, which "provokes an immediate negative visceral reaction" and "raises the spectre of the Orwellian state"); *United States v. Torres*, 751 F.2d 875, 882 (7th Cir. 1984) (Posner, J.) ("We think it also unarguable that television surveillance is exceedingly intrusive ... and inherently indiscriminate, and that it could be grossly abused—to eliminate personal privacy as understood in modern Western nations."); *Carter v. Cnty. of L.A.*, 770 F.Supp.2d 1042, 1050–51 (C.D. Cal. 2011) ("Covert video surveillance is not a traditional tool.... Outside of a strip search or a body cavity search, a covert video search is the most intrusive method of investigation a government employer could select. Secret videotaping goes against the grain of our strong anti-Orwellian traditions.").  In its opposition brief the government fails to justify the extraordinary invasiveness of the video and audio surveillance employed in this case.

Because it is understood that surveillance inside a home should be used very sparingly, courts require the government to demonstrate that monitoring of this type is actually necessary and

that legitimate law enforcement goals could not be achieved through less intrusive means.  Yet the cases cited by the government in support of application of a relatively low bar for establishing necessity involved audio monitoring of telephone calls, a much more commonly-used law enforcement practice that implicates far less serious privacy concerns.  ECF No. 122 at 7-8.  *See, e.g., United States v. Smith*, 31 F.3d 1294, 1296 (4th Cir. 1994) (challenge to court-authorized surveillance of home telephone); *United States v. Oriakhi*, 57 F.3d 1290, 1298 (4th Cir. 1995) (same); *United States v. Depew*, 932 F.2d 324, 327 (4th Cir. 1991) (same); *United States v. Leavis*, 853 F.2d 215, 221 (4th Cir. 1988) (same); *United States v. Galloway*, 749 F.3d 238 (4th Cir. 2014) (same).  None involved the highly intrusive investigatory technique involved in this case: live audio and video monitoring of the inside of a private residence.

The Fourth Circuit has not yet squarely addressed the extent to which the government must demonstrate necessity and exhaustion of other investigative techniques before such an extraordinary invasion of privacy can be authorized.  Those courts that have addressed video surveillance inside private property have employed a high bar in determining whether it was in fact necessary.  *See, e.g., United States v. Mesa-Rincon*, 911 F.2d 1433, 1442 (10th Cir. 1990), *holding modified by United States v. Castillo-Garcia*, 117 F.3d 1179 (10th Cir. 1997) ("as the intrusiveness of the method used increases and the expectation of privacy in the premises searched increases, the government's showing of necessity increases and must be more clearly established," and "[t]he showing of necessity needed to justify the use of video surveillance is higher than the showing needed to justify other search and seizure methods, including bugging"); *United States v. Falls*, 34 F.3d 674, 679 (8th Cir. 1994) (video surveillance should be allowed only in limited circumstances).  "At the very core" of the Fourth Amendment "stands the right of a man to retreat into his own home and there be free from unreasonable governmental

15

intrusion." *Silverman v. United States,* 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961). Moreover, "[t]he touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno,* 500 U.S. 248, 250, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991).   This Court should consider the exceedingly intrusive investigative techniques employed here in determining their reasonableness under the circumstances.   The government here has failed to establish that law enforcement exhausted other, less-intrusive investigative techniques and that the investigative goals were important enough to allow this unusual, highly intrusive surveillance.

### A.   The Affidavits Did Not Prove Exhaustion of Less-Intrusive Investigative Methods

The exhaustion analysis must take into account the information law enforcement had already gathered at the time agents sought permission to place video and audio recording equipment inside the Delaware apartment.   This is important not solely in evaluating how productive these techniques *had been*, but also whether these techniques could be counted on to produce more information had law enforcement continued to employ them before resorting to video and audio monitoring inside the apartment.   At the time the government sought permission to commence video and audio surveillance within the Delaware apartment, agents were already performing extensive surveillance of Mr. Lemley and Mr. Mathews, including following and photographing them when they left the Delaware apartment; they had obtained historical GPS data for phones linked to Mathews and Lemley and were also doing real-time GPS location monitoring using their phones; they had obtained the contents of email accounts linked to each man including their internet search histories; a camera had been placed in the public hallway of the Delaware apartment building and was trained on the front door of the apartment; and an undercover agent had infiltrated the Base months earlier and had been in close communication with Mr. Lemley and Mr. Mathews.

In particular, the undercover agent was fully integrated into the Base and was enabling agents to gather comprehensive information about the targets of their investigation.  The agent was able to view and take part in chat exchanges on the encrypted message board used by the Base. The agent attended at least four gatherings of Base members at the home of a member in Georgia before the government sought to commence monitoring the inside of the Delaware apartment.  Two of those gatherings each lasted three days.  During each gathering the undercover agent had been able to record hours of conversations among members including Lemley and Mathews.  Nothing in those recordings suggested an effort to withhold information about plans or actions from this undercover agent.  To the contrary, much of the information contained in the CCTV affidavit was drawn from those recorded conversations.

There was every reason to believe that law enforcement could continue to rely upon this undercover agent to gather any other necessary evidence.  To the extent law enforcement wanted to see the inside of the Delaware apartment or learn what was being discussed therein, they could have simply directed the undercover agent to propose a meeting there.  Nothing about Mr. Lemley's or Mr. Mathews' behavior up to that point suggested they would refuse to permit the undercover to visit them.  The government places great weight on the fact that agents observed Mr. Lemley and Mr. Mathews leave the apartment when they communicated with the undercover agent over the encrypted app on one occasion, but provides no clear explanation as to why this suggests they would have been unwilling to welcome him into their apartment.

Because the undercover agent had been welcomed onto the Georgia property where Mr. Mathews lived for a period of time and where "training camps" were held, it was clear he would also be welcomed into the Delaware apartment.  The government has suggested that the location of the Georgia "training camps" was a closely-held secret among Base members.  For example,

17

law enforcement believed that Mr. Lemley avoided entering the property via a main entrance to evade surveillance by law enforcement or encounters with non-Base members.  Ex. C at 27. Importantly, in the December 11, 2019 warrant affidavit Agent Harrison indicated that the Georgia property and the Delaware apartment were similar in in this respect: "The Georgia property has certain similarities to the Target Residence, in that it provides Mathews safe haven and a location of comfort in which he could discuss and perpetrate criminal activity with like-minded confederates." Ex. G at 62.  The December 11, 2019 affidavit is rife with statements by Mathews made while on the Georgia property in the presence of the undercover agent, including alleged discussions of "acquiring firearms and conducting attacks" and "taking part in future operations." Ex. G at 60-62.  The undercover agent had been welcomed to the secret Georgia property and had been privy to every aspect of Mathews's and Lemley's communications while there.  Nothing in the affidavit or the government's opposition suggests that he would not have received the same welcome at the Delaware apartment.

Indeed, when the undercover agent did suggest such a meeting, he was invited into the apartment on January 11, 2020 and was able to record hours of conversations with Mr. Mathews and Mr. Lemley in which each spoke without any apparent discretion.  While this meeting occurred after the issuance of the CCTV and wiretap warrants, it is by no means irrelevant to this Court's exhaustion analysis.  To the contrary, the fact that the undercover agent was welcomed into the apartment demonstrates that 24-hour surreptitious audio and video monitoring was unnecessary because less-intrusive alternatives existed had they been attempted earlier.

**B.     The Government's Stated Investigative Goals Did Not Justify Surveillance Within a Private Home**

In the December 11, 2019 CCTV affidavit, Agent Harrison explained why entering the apartment surreptitiously to perform a comprehensive search and install hidden recording

18

equipment was necessary. Exhibit G at 64-65. First, Agent Harrison indicated that video surveillance would enable law enforcement to determine "the methods in which Base members have transported and harbored Mathews," and "the identities of co-conspirators involved in the harboring of Mathews." *Id.* In its opposition brief, the government acknowledges that "of course agents knew Lemley was harboring Mathews; the affidavit expressly says so." ECF 122 at 27. The government argues that it was instead important to show that Mr. Lemley would "take other actions to transport Mathews to other residences, with other unknown co-conspirators, as already had happened in the past." *Id.* Yet agents were already aware that Mr. Mathews was living in an apartment rented by Mr. Lemley. They had performed surveillance and obtained GPS data showing Mr. Lemley driving with Mr. Mathews. Under the circumstances, it cannot possibly be said that it was necessary to undertake a drastically intrusive invasion of privacy to gather more evidence along these lines. Moreover, to the extent any such evidence was needed, the extensive surveillance being performed when Mr. Lemley or Mr. Mathews left the apartment would have provided answers to agents' questions about whether Lemley or other co-conspirators would further transport Mathews.

Second, Agent Harrison asserted that CCTV surveillance was necessary in order to determine the presence and distribution of narcotics. Exhibit G at 65. Suspected narcotics distribution was clearly an inconsequential aspect of this investigation. The sum total of information about this alleged offense in the affidavits was the claim that Mr. Lemley offered Adderall to an unknown number of Base members in attendance at a "training camp" in Georgia four months earlier. *Id.* at 38. Particularly in light of the intrusiveness of the search here, the Court should lend little credence in its necessity analysis to a law enforcement expression of interest in

investigating narcotics distribution by Mr. Lemley.[3]  If any more information about Adderall was actually needed, agents could have used alternative investigative methods, including enlisting the assistance of the undercover agent.

Third, Agent Harrison asserted that CCTV surveillance was necessary in order to determine the presence and possession of firearms.  *Id*.  Here again the investigative steps law enforcement had employed and could have continued to employ were more than sufficient to obtain this information.  As set forth above, the undercover agent had already by this time established a close relationship with Lemley and Mathews; neither Mathews nor Lemley demonstrated any reluctance to speak openly about their views or actions when in the undercover agent's presence.  The undercover agent could have been prompted to ask questions of Mathews and Lemley or to simply do what he did successfully a few weeks after the warrant was issued: invite himself over to Lemley and Mathews' apartment to see first-hand whether Mathews had obtained and possessed a firearm.  Here again it is important to note that traditional surveillance work permitted agents to allegedly view Mathews and Lemley in possession of firearms at a gun range on two occasions after the CCTV warrant was issued.  The point here is that subsequently-performed investigative steps that did not implicate privacy concerns were effective at gathering the information Agent Harrison sought.

The government's failure to demonstrate necessity was even more glaring with respect to the December 18, 2019 Title III audio warrant application.  It is important to recall that at the time the government sought approval to commence audio recording within the apartment, agents had already been observing a live video feed inside the apartment for approximately five days after the

_____

[3] The defendants were ultimately indicted on twelve total counts.  Distribution of controlled substances was not among them.

sneak-and-peek and CCTV warrant was executed on December 13, 2019.  To obtain approval to commence listening to communications within the apartment, the government was therefore obliged to establish why being able to *watch* everything occurring in the apartment was insufficient and that agents needed to be able to also *listen* to everything those inside the private residence were saying.  This Agent Harrison attempted to do at paragraph 136(b)(vi) of the December 18, 2019 affidavit. Ex. J at 76.  In essence, Agent Harrison contended that video surveillance without accompanying audio had not yielded the identity of co-conspirators or given complete information about what violent crimes the subjects were planning.  Law enforcement at this time already had a very good sense based upon review of exchanges on the encrypted chat room, the undercover's attendance at Base "training camps," and review of email and online records associated with Lemley and Mathews who the active members of the Base were.  Audio surveillance was not needed to determine this information.  And the undercover agent had proven to be adept at gathering information from Base members including Mathews and Lemley about whether any plans were actually afoot.  These investigative techniques would have continued to be fruitful had the audio surveillance within the Delaware apartment not occurred.

## III.    The Good Faith Exception Does Not Save the Defective Warrants

The government argues that even if the affidavits in this case failed to establish probable cause, the good faith exception to the warrant requirement renders suppression inappropriate. ECF No. 122 at 25, 28, 31-32.  Pursuant to that exception, "a reviewing court should not suppress evidence discovered under the authority of a warrant, even a subsequently invalidated warrant, unless a reasonably well trained officer would have known that the search was illegal despite the judicial officer's authorization."  *United States v. Wellman*, 663 F.3d 224, 228 (4th Cir. 2011).  But the exception does not apply – and suppression is therefore required – when officers "rely on an affidavit so lacking in indicia

21

of probable cause as to render official belief in its existence entirely unreasonable." *United States v. McKenzie-Gude*, 671 F.3d 452, 459 (4th Cir. 2011).

Here, the initial warrant applications do not provide a "reasonable" basis to believe probable cause existed. The September 5, 2019 application, for instance, provides no facts indicating Mr. Lemley had violated § 2101 (the anti-rioting statute) or § 249 (the hate crime statute). With respect to those offenses, it therefore wholly failed to identify conduct that is "prohibited by law." *Williams*, 740 F.3d at 312. Although the application arguably alleged distribution of a controlled substance, under § 841, it failed to establish a reasonable nexus between that offense and Mr. Lemley's phone. Reliance on the September 5th warrant was therefore unreasonable.

Reliance on the October 2nd warrant was even less reasonable. The application in support of that warrant included no new facts indicative of a § 2101 or § 249 violation, and it in fact supplied affirmative reason to believe Mr. Lemley's cell phone would *not* contain evidence of drug distribution, as data recovered under the first warrant showed he turned the phone off during the period when he allegedly distributed Adderall. And the application failed to provide any facts at all to support key aspects of a § 1324 violation, e.g., that Mr. Lemley "physically transport[ed]" Mr. Mathews across the border, that he harbored Mr. Mathews "*because* he's an illegal alien," or that he knew of or recklessly disregarded Mr. Mathews' immigration status. Thus a reasonable officer would not have relied on the October 2nd warrant.

Similar defects, described above, foreclose reasonable reliance on most of the subsequent warrants as well. In other cases, the warrant applications contain sufficient facts to demonstrate probable cause, but those facts were discovered through execution of previous

22

invalid warrants.  Reliance on the December 18th wiretap warrant, for example, was likely not unreasonable, given its allegations that in the Newark apartment agents found an empty pistol holder near Mr. Mathews' bed, components of an assault rifle in a closet, and a list of items on which Mr. Mathews had allegedly crossed off "SKS," which agents believed was a firearm.  *See* ECF No. 110 at 36-37.  But such evidence cannot contribute to probable cause, as agents discovered it pursuant to the December 11th sneak-and-peek warrant, on which it was unreasonable to rely.  *See DeQuasie*, 373 F.3d at 519; *Fall*, 955 F.3d at 372.  And if agents could not reasonably rely on the sneak-and-peek warrant, they also cannot reasonably rely on a subsequent warrant that rests on its fruits.  To admit evidence seized pursuant to that subsequent warrant would be to condone exactly the "deliberate, reckless, or grossly negligent conduct" that the exclusionary rule is intended to deter.  *Herring v. United States*, 555 U.S. 135, 144 (2009).

Moreover, even if the *Leon* good faith exception applies to wiretap orders, which the defense does not here concede, the above discussion of the agents' failure to establish necessity for the audio and video surveillance demonstrates that the agents did not act reasonably and in good faith in obtaining the CCTV and wiretap warrants.  The agents had available to them a wide range of investigatory techniques which had borne fruit and would have continued to bear fruit had the agents not resorted to the drastic measure of seeking to install monitoring equipment inside a private residence.  The agents obtained approval for this practice by downplaying the effectiveness of less intrusive methods and inaccurately representing that surveillance within the apartment was the only way agents would be able to gather necessary evidence.  This is precisely the type of conduct the exclusionary rule is intended to deter.

Finally, the government suggests agents could reasonably rely on the warrants in this case because the underlying applications were approved by prosecutors overseeing the investigation. ECF No. 122 at 31-32. But while a "prosecutor's and supervisor's review of an application is often helpful in determining good faith," it "cannot be regarded as dispositive." *United States v. Lyles*, 910 F.3d 787, 796 (4th Cir. 2018). As the Fourth Circuit has explained, "those reviewers, unlike a neutral magistrate, share the officer's incentives in the often competitive enterprise of ferreting out crime." *Id.* If a prosecutor's approval of a warrant were sufficient, then "police departments might be tempted to immunize warrants through perfunctory superior review, thereby displacing the need for a neutral and detached magistrate to make an independent assessment of an affidavit's probable cause." *Id.* at 796-97.

## CONCLUSION

For the reasons described above, this Court should suppress all evidence seized pursuant to the eleven search warrants challenged herein.

Respectfully submitted,

JAMES WYDA
Federal Public Defender

_____/s/_____
NED SMOCK
Assistant Federal Public Defender
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770-4510
(301) 344-0600
(301) 344-0019 (fax)
Email: ned_smock@fd.org