**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | | |
| **v.** | * | **Criminal Case No. TDC-20-0033** |
| | | |
| **PATRIK MATHEWS** | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

<u>**DEFENDANT'S SENTENCING REPLY**</u>

Patrik Mathews pled guilty to firearms offenses and the obstruction of justice. He accepted responsibility for his conduct and is remorseful. The United States Probation Office correctly calculated the U.S.S.G. advisory guideline range to be 33-41 months imprisonment. At the time of sentencing, counsel will recommend a sentence of 33 months imprisonment.

The government seeks a dramatic sentencing enhancement based on the argument that Mr. Mathews' offense was intended to promote a federal crime of terrorism and recommends a sentence of twenty-five years imprisonment. Mr. Mathews vehemently rejects the accusation that he ever intended to promote a federal crime of terrorism and contends the government's request to apply the terrorism guideline should be denied.

I.      **INTRODUCTION.**

Mr. Mathews was arrested in January, 2020, and charged with being an illegal alien in possession of a firearm, possession of a firearm in connection with another felony offense, and obstruction of justice. The allegation that Mr. Mathews intended to promote a federal crime of terrorism arises from his membership in the Base, a white nationalist organization, associated

1

with virulent speech. The government initiated an investigation of the Base and connected Mr. Mathews, and codefendant, Brian Lemley, to membership in the organization. The investigation led to the installation of an eavesdropping bug and a CCTV video camera in the defendants' Newark, Delaware apartment, in December, 2019. As a result of the eavesdropping, the government intercepted and recorded hundreds of hours of conversations, much of it related to discussion of Base ideology and beliefs. During the course of the surveillance, the government became suspicious that Mathews and Lemley would participate in a gun rights rally in Richmond, Virginia on January 20, 2020. In advance of the rally, the government arrested the defendants on January 16, 2020. Mr. Mathews was charged with the possession of a firearm recovered in the apartment and obstruction of justice.

The intercepted apartment conversations were replete with virulent hate speech and references to imagined acts of violence against property, minorities and government. However, the government's conclusion that the conversations evinced the requisite intent is wrong. These conversations did not establish that Mr. Mathews and Mr. Lemley had any intent to actually promote crimes of terrorism. The content of the conversations showed there were no plans to carry out any crime of terrorism. The conversations reflected the defendant's beliefs and advocacy of ideas that many would find repugnant. Discussion of such ideas, especially within one's own home, do not establish the intent to commit crimes of terrorism. The government's evidence conspicuously omits any reference to substantial steps or planning that portray intent.

The intercepted conversations contain hate speech and advocacy of violence that are protected speech under the First Amendment to the United States Constitution. Mr. Mathews appreciates that he is not being prosecuted for the exercise of his free speech. However, much of

the content of the speech contained in the intercepted conversations enjoys protected status. Mr. Mathews contends that the highly inflammatory nature of his expressions should not be a deciding factor in determining whether the conversations act as evidence of intent to promote federal crimes of terrorism.

The government's sentencing recommendation of twenty-five years of imprisonment would result in grossly disproportionate sentencing outcome. Since this case was initiated in January 2020, the United States government has prosecuted many other individuals in districts around the country for similar offenses, involving hate speech and anti-government violence. In the United States Capitol breach cases alone, the government has initiated prosecutions against more than 600 people charged with committing offenses that arguably were intended to promote crimes calculated to influence the conduct of the government, through intimidation and coercion. In those cases, the defendants not only intended to promote crimes to influence government, they took concrete steps to plan and carry out acts of intimidation and coercion against government. These cases are all distinguishable from the case against Mr. Mathews, who never planned or took any steps to carry any crimes of federal terrorism.

In the Capitol breach cases, and many other cases throughout the country, the government has not sought to apply the terrorism guideline or to seek disproportionate sentences outside the advisory guideline range. In many cases involving comparable conduct and hate speech, the government sought sentencing outcomes based on the underlying conduct, rather than multi-fold increases in sentence, based on the defendant's beliefs and expressions. These cases resulted in sentences well under 5 years imprisonment for comparable conduct and anti-government beliefs.

The unique factor that distinguishes Mr. Mathews' case from many of those other cases around the country, is the sheer breadth of the investigation and surveillance of the defendants. The government's evidence of hate speech is culled from hundreds of hours of recorded conversations. In those other cases, references to hate speech and anti-government violence was cited from social media posts and text messages because the government did not have access to 24/7 surveillance within the defendants' homes, as authorized in the current case. One can surmise, if the Capitol breach defendants had been subject to an equivalent level of investigation, the amount of evidence of hate speech and advocacy of violence would have been similarly vast.

Mr. Mathews contends that application of the terrorism guideline in this case would mark an aberration in the way cases involving extremism and anti-government beliefs have been handled by the government around the country. Mr. Mathews requests that he be sentenced pursuant to the advisory guideline calculated by the United States Probation Office, which would result in a proportionate sentence and will reflect a uniform approach to sentencing similarly situated defendants.

## II.    FACTUAL BACKGROUND.

Mr. Mathews, a Canadian national from Manitoba province, fled to the United States in August 2019, after his membership in the Base had been outed by a local reporter. Having been humiliated by the newspaper article, Mr. Mathews fled Canada and met up with codefendants Brian Lemley and William Bilbrough. When the FBI identified Mathews and Lemley as Base members, a federal investigation ensued. On December, 13, 2019, the government obtained a warrant that allowed them to secretly search the Delaware residence and install an eavesdropping bug and a CCTV camera. This provided agents with constant real-time surveillance of the

apartment and recordings of any statements made within the premises. During this period, an undercover FBI agent ("UCE"), who had infiltrated the Base, visited the defendants' apartment.

The eavesdropping intercept resulted in the collection of hundreds of hours of recordings reflecting the details of every topic of conversation between Mathews and Lemley. The activities and ideology of the Base were a frequent topic. Many of the conversations discussed hypothetical or imaginary situations in which anti-government and anti-civilian violence might occur, after the emergence of a civil war within the United States. The discussions were spontaneous and sporadic and never escalated to a level that involved realistic planning. The violent ideas reflected Base ideology ranging from killing, to destruction of property, to the disruption of government.

On December 13, 2019, the government searched his computer and identified a series of personal video statements Mr. Mathews recorded. There is no evidence that the recordings were ever shared or otherwise disseminated. The government offered one particular video, recorded on November 13, 2019, prior to the installation of the eavesdropping bug, as purported evidence of Mr. Mathews' state of mind. ECF No. 169, at 20-21; Gov. ex. 25, 25a. The government also attached a screenshot taken from the video showing Mr. Mathews sitting at the computer wearing a gas mask. Gov. ex.26. In an excerpt from the video, Mr. Mathews expressed racial hatred and grievance, predictions of violent revolution, and posed rhetorical questions about whether the white race will survive. The rhetoric predicts doom, "[t]his is the age of entire this is the age of strife, this is the century upon which this current civilization...comes to a collapse." Mr. Mathews' dystopic view of the future is coupled with grandiose predictions about "preparing to do what needs to be done...[d]erail some fucking trains, kill some people, and poison some

water supplies." ECF No. 169, at 19. The video clip shows a bizarre image of Mr. Mathews, dressed up in costume, wearing a gas mask, identifying as the "bad guy," practicing Base rhetoric. There does not appear to be any reason for Mr. Mathews to wear the gas mask other than to play-act for the video. While Mr. Mathews portrays himself as the "bad guy" in the video, this portrayal runs contrary Mr. Mathews' lifelong profile—a young man with absolutely no criminal activity or record of violence. The statements identify no particular plan or target for violence. The only time frame suggested for the impending collapse is "this century." Mr. Mathews' conduct in producing this personal statement, neither shared nor disseminated, shows no intent to promote any crime of federal terrorism.

The government notes the incredible breadth of "secretly-recorded rhetoric" that was collected pursuant to the warrants, reflected in the 1,136 pages of Title III line sheets. ECF No. 169, at 21. The government incorrectly concluded that these convoluted conversations represented intent to promote federal crimes of terrorism. *Id.* at 21-22.

The government alleged that the intercepted conversations showed the defendants were "enamored with the idea that the Boogaloo would begin in Richmond, Virginia in January, 2020." *Id.* at 22. The conversations revealed that the Richmond gun rights rally was a topic of interest for Mathews and Lemley. Mr. Mathews had every right to be "enamored" with the idea of a "boogaloo" and express his political opinions about the matter, without necessarily having intended to promote federal crimes of terror. The government incorrectly equates every discussion between the defendants, which included content about their personal beliefs and thoughts regarding anti-government violence as evidence of intent to promote federal crimes of terrorism. The government makes no attempt to distinguish valid expressions of protected

speech, with actual planning for an unlawful act. Because the government relies upon the expressions of speech alone, without any realistic evidence of actual planning to accomplish any criminal acts, the request for application of the terrorism enhancement should fail.

The government's "Timeline Summary," ECF No. 169, at 20, sought to highlight a number of the conversations which touched on inflammatory topics related to racial hatred and advocacy of violence. The excerpt from the December 18, 2019 reflects a conversation in which Mr. Mathews expressed unpopular views about interracial relationships, Gov. ex. 27, 27a. Mr. Mathews' statements may have been odious and offensive but they do not reflect an intent to promote a crime of terrorism. The government highlights another conversation in which Mr. Mathews states that "back in the day" riots were started by whites and "[w]e need to bring that back." Gov. ex. 28, 28a. His references to "decimating" and to "shoot them" about black people are clearly statements of hyperbole, which though offensive, reflect no intent to promote a crime of terrorism.

The government sets forth excerpts from conversations on December 21, 2019, which are the first conversations that reference the anticipated "Virginia" gun rally events. Gov. ex. 29, 29a; 30, 30a. Mr. Mathews poses hypothetical events to "derail some rail lines", "shut down highways" and "kick off the collapse." On December 29, Mr. Mathews talked about damaging a 5G cell tower, and imagining shutting down the internet. Gov ex. 37, 37a. Later, on December 29, 2019 he mentioned "going on the outskirts hitting every trail, every-train line everything...." Gov. ex. 38, 38a. On December 26, 2019, there was discussion imagining destroying rail lines and power lines in Virginia. Gov. ex. 35, 35a. These statements do not reflect any real plan to carry out terrorist crime. The conversations are generally fleeting references to imaginary

scenarios without any serious exploration about particular targets or planning operations. There is no evidence that Mr. Mathews had ever been to Richmond to explore the area where the gun rights rally was to take place. The conversations all follow a similar vein in which discussion would focus for brief periods on generic acts of violence without a reference to developing a specific plan.

The government also focused on Mr. Mathews' recurring conversations about hypothetical killings of law enforcement officers or civilians. Similar to the references to property damage, the conversations all appear to be extemporaneous expressions of momentary ideas, associated with anti-government activity. *See* Gov. ex.31, 31a (discussing shooting at law enforcement in darkness and stealing police gear); Gov ex. 33, 33a, 34, 34a (discussing springing Dylan Roof from jail). These conversations are entirely extemporaneous and fleeting in nature.

The only event the government alleges that provided a specific focus for potential activity by Mr. Mathews was a gun rights rally on January 20, 2021 in Richmond, Virginia. The rally had been widely publicized as a demonstration by gun-rights activists to protest plans by the state's legislative leadership to pass gun-control legislation, a move that became a key point in the national debate over gun violence. The FBI had been carefully monitoring the interest in the rally by extremist groups and feared it could lead to violence.

The government's basic argument in support of the terrorism guideline is that Mr. Mathews and Mr. Lemley intended promote a crime of terrorism by participation in the Virginia activities. Mr. Mathews rejects that argument. In fact, Mr. Mathews did not plan to attend the rally in Richmond because he was scheduled to work that day.

The Virginia gun rights rally was simply another fleeting idea that came up as a discussion point between the defendants. The defendants engaged in hypothetical conversations, wondering what might happen if the boogaloo broke out during the Virginia gun rights rally.

These conversations were captured on December 29, 2019 during Session 1016. *See* Gov. ex. 37a. The defendants continued to sporadically discuss the Virginia rally, but more to the extent that it is a newsworthy event and they were debating whether or not the boogaloo would emerge out of Virginia.

On January 11, 2020, the FBI undercover agent ("UCE") arrived with a clear intent to pressure the defendants into developing a plan for Virginia. Session 2184. While the UCE managed to bait the defendants into discussing some imaginary plans—as they commonly discuss while intoxicated—whenever the UCE attempted to pin down a substantive plan, the defendants consistently asserted that they did not plan to attend or really do anything in Virginia. Examples of such statements include:

> Session 2185, Mathews: "Right now we're not going we're we're right now eschewing the Virginia plan for the Michigan plan because the way that it looks like to me is that the government is going to wait out until these protests die out until they're gonna pass the real meat and potatoes after the 20th. I think they're gonna boil the frog a bit slow here. But then I'm not sure what they're going to do because I see that the laws are being passed slowly and strategically. They've already passed a law that says you cannot bring guns into the capital building. UI still have an open carry on the capital premise."

> Session 2185, Lemley: "Well anyways, um, so we're definitely going up to Michigan and um we'll be heading back on the Sun sometime before 6pm on Sunday that'll get us back here by like 6am Monday so he can go to work. I, on the other hand, still have two more vacation days, so I was wondering what I would do with those . . . ."

> Session 2192, Lemley: "Virginia is a dangerous situation. We can't go into the city because its not our - its for one its gonna a doxing fiasco. Two, uhm most - almost guaranteed false flag. ok, three uhm."

During his January 11, 2021 visit, the UCE did everything in his power to encourage the defendants to develop a plan for violence in Virginia. The UCE repeatedly pressed Mr. Mathews and Mr. Lemley about any plans, but never got any consistent answers. Their responses involved impulsive ideas about what could happen, rather than reflecting any particular plans they had already conceived.

## III.    LEGAL ARGUMENT.

### a.  U.S.S.G. § 3A1.4 Enhancement

The terrorism guideline provides for an enhancement in the offense level to 32 if the offense is a felony that involved, or was intended to promote a federal crime of terrorism. U.S.S.G. §3A1.4. A federal crime of terrorism is one of an enumerated list of crimes under 18 U.S.C. §2332b(g)(5) and is calculated to influence or affect the conduct of government by intimidation, coercion, or to retaliate against government conduct. *See United States v. Mandhai*, 375 F.3d 1243, 1248 (11th Cir. 2004) (if that purpose is to promote a terrorism crime, the enhancement is triggered). The felonies that Mr. Mathews pled guilty to are not enumerated crimes. Mr. Mathews objects to application of the guideline on that ground.

The government also argues that a defendant who intends to promote a federal crime of terrorism, but has not necessarily completed, attempted, or conspired to commit the crime, is subject to the terrorism enhancement if the defendant's conviction crime was intended to promote an enumerated federal crime of terrorism. *United States v. Graham*, 275 F.3d 490, 516 (6th Cir. 2001). The government relies on this argument because in Mr. Mathews' case, there was no completed crime, attempted crime or a conspired crime of terrorism.

Rather, the government emphasized an incredible amount of hate speech and talk of violence that was reflected in the recorded conversations. If anything, the sheer amount of intercepted conversations, without the accomplishment of a single step towards any of the acts discussed would seem, inferentially, to support the conclusion that the defendants did not intend to commit any of the fleeting ideas, during various conversations within the home.

The government has alleged that the defendant intended to promote several of the enumerated crimes of terrorism. Notably the government did not charge any of the crimes as substantive offenses, nor did they charge a conspiracy based on any enumerated crimes. It is also noteworthy that the target offenses listed in the various search warrants, including inciting a riot and attempted hate crime, did not result in the filing of charges.

The reason that the government did not charge any of the enumerated offenses is that the evidence gathered from the conversations could not possibly have sustained criminal charges: there were no completed crimes; there were no attempted crimes; there were no conspiracies. While the defendants talked endlessly, those conversations did not add up to a single indictable enumerated offense. The reason for this failure is clear. While the defendants *talked*, they did not *act*.

The circumstances in this case are totally distinguishable from those of the other cases in which courts have applied the terrorism guideline. Generally, the guideline has been imposed where the proof of the underlying conduct of the enumerated offense was far more substantial than the evidence in this case. *See Graham*, 27 F.3d at 497 (involving numerous documents steps and plans towards terrorist acts); *Mandhai,* 375 F.3d at 1248 (concluding that "there was substantial evidence supporting the district court's finding that the object of Mandhai's crime was

11

to influence or affect government conduct, or to retaliate against past government action," and stating that "Mandhai's goal was to bomb and disable public utilities in the hopes that power outages would lead to civil strife and upheaval on the streets of Miami."). The court in *Mandhai* further explained,

> [t]he object of Mandhai's conspiracy—destroying buildings used in interstate commerce by fire or explosives under 18 U.S.C. § 844(i)—is specifically listed as a federal terrorism crime in 18 U.S.C. § 2332b(g)(5)(B). But conspiracy to do so under 18 U.S.C. § 844(n) is not. In light of this, Mandhai argues, he did not commit a federal crime of terrorism to which the enhancement applies."

*Id.* at 1247. This is a prime example of a correct application of the terrorism enhancement. The government's intent to apply the terrorism enhancement in the current case is extremely misplaced and strikes against the integrity of an important sentencing enhancement, directed against the most dangerous of crimes.

In *Graham*, the defendant was a member of a militia group that advocated to overthrow the government and for an offensive "first strike' against the government. 27 F.3d at 497. The group was highly organized and regularly coordinated very specific tasks. *Id.* Mr. Graham belonged to a group that collected and stockpiled weapons; held target practice and conducted paramilitary training; selected federal and state "hard and "soft" targets and plotted strategies. *Id.* at 497. Notably, the Mr. Graham plotted strategy to attack specific targets. *Id.*

> Graham was the leader of one of the three-person cells and he "reconned" his assigned region, meaning he visited his assigned attack area and surveyed his targets. *Id.* At one meeting, on June 17, 1997, he drew a map of Stumpenhaus's assigned region, marked targets for him to attack including four electrical targets, a V.A. hospital, a gas station, Fort Custer, and a television station, and told him he would help him to "reconn" the area. *Id*. He also made numerous statements indicating that he was ready to attack his assigned targets; that he possessed a wide variety of weaponry; and that he was prepared to kill.

*Id. Graham* is instructive as an example of a case involving anti-government activities from which the Court made a finding that the defendant promoted crimes of terrorism based on substantial evidence of planning. Mr. Graham did more than just talk inside an apartment. Mr. Graham's conduct included meticulous planning. Unlike the current case, the concrete steps taken by Mr. Graham provided a great deal of proof he intended to promote a federal crime of terrorism which was calculated to influence government through intimidation and coercion.

The defendants in this case did no planning. The is no evidence that Mr. Mathews had ever visited Richmond, Virginia, "reconned" or surveyed any target areas; identified any specific locations; created any maps with marks that would reflect a serious intent to commit the crime of terrorism. The statements made inside his apartment did not establish the requisite intent to promote a federal crime of terrorism.

As noted, the defendant contests the application of the terrorism guideline U.S.S.G. §3A1.4, which provides for an upward adjustment of the offense level to 32 and an increase in the criminal history to Category VI. The defendant requests, that in the the unlikely event where the §3A1.4 guideline is applied, that the Court should grant a downward departure to criminal history Category I, based on Mr. Mathews' complete lack of prior criminal history. Mr. Mathews is, in-fact, a criminal history category I and such an adjustment would severely overstate his criminal history.

### b.  Mr. Mathews Speech Is Protected Under the First Amendment.

Mr. Mathews' racist statements and advocacy of violence represent "protected speech" under the First Amendment. The intercepted conversations are replete with Mr. Mathews' political opinions about race, anti-Semitism, and advocacy for anti-government and political

violence. Mr. Mathews' speech itself cannot be the subject of prosecution. *See Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (holding that the state may not forbid or proscribe advocacy for the use of force or of law, except where such advocacy is directed toward inciting or producing imminent lawless action and is likely to incite or produce such action). In pretrial motions, the government previously noted that Mr. Mathews is not being prosecuted for his speech, arguing his speech is merely indicative of his intent to commit other crimes. Mr. Mathews accepts that he is not being directly sanctioned for his speech. However, the First Amendment protects the right to advocate politically unpopular beliefs so long as it does not incite imminent violence. Mr. Mathews contends that the terrorism guideline must be interpreted in a way that is consistent with the First Amendment.

## IV.   THE COURT SHOULD IMPOSE A PROPORTIONATE SENTENCE.

In determining the appropriate sentence for Mr. Mathews, the Court should consider the sentences imposed in comparable cases. Specifically, the Court should consider similar cases in which the government negotiated a guideline sentence, without seeking an upward variance or a terrorism enhancement, even though the case involved significant issues of racial hatred or anti-government motivation. An enhancement that has the potential to convert a very short sentence into a sentence of over 20 years cannot be applied haphazardly and courts have been diligent in not administering this enhancement broadly.

The defendant has attached a chart of recent similar cases involving similarly situated and politically aligned defendants who were sentenced, based on their conduct. Attached as Exhibit

1.[1] The recency of these cases is relevant as well, given these defendants were involved with similar extremist groups, based on similar information, largely propagated over the internet, during a period of political divisiveness.

### a. *Proportionate Cases.*

Recently, in *United States v. Reed*, 20-cr-0406-ELH (D. Md.), James Dale Reed was sentenced to 7 months incarceration and 4 months of home detention for Threats to a Major Candidate for Office of President or Vice President in violation of 18 U.S.C. § 879. In Mr. Reed's case, he disseminated at least one letter that stated anyone reading this letter "if you are a Biden/Harris supporter you will be targeted." Additionally, Reed wrote that he intended to capture President Biden "and beat him to the point of death." He further wrote, "as for Mrs. Harris she will be bent over and anally raped by my rifle barrel." 1:20-cr-0406-ELH, ECF No. 4 (Criminal Complaint). Ultimately, the government and the Court determined that Mr. Reed was not a serious danger, but rather an intoxicated man who wrote an angry letter.

In *United States v. Olsen*, 19-cr-0494 (N.D. Oh.), Mr. Olsen wrote online posts to more than 5,000 followers about supporting mass shootings, attacks on Planned Parenthood, and bombing gay bars. In one online post, he stated, "Shoot ever federal agent on sight." The search of home revealed 15 rifles, 10 semi-automatic pistols, 10,000 rounds of ammunition, and a machete. Mr. Olsen was sentenced to 3 years of probation.

In *United States v. Climo*, 19-cr-0232 (D. Nev.), Conor Climo was an active member of the Nazi hate group "Feuerkrieg," and revealed potential plots to firebomb a synagogue or attack

---

[1] Chart prepared in conjunction with the Federal Public Defender, which is also attached as an exhibit in the codefendant's Reply.

a gay bar in Las Vegas to an undercover FBI Agent. Mr. Climo mapped out his attacked plans using physical sketches of the bar and a McDonald's. The search of his home revealed two rifles and bomb-making materials. In his detention order, the Magistrate wrote, "The defendant had very specific plans about attacking one specific synagogue near his house." Climo, 19-cr-0232, ECF. No. 7. Ultimately, Mr. Climo pled guilty to Possession of an Unregistered Firearm in violation of 18 U.S.C. § 5845(f) and was sentenced to 24 months imprisonment and 6 months of home confinement.

In *United States v. Smith*, 19-cr-40091 (D. Kansas), Jarret Smith discussed plans to conduct an attack within United States, to kill members of Antifa and to destroy nearby cell towers or local news station. *Smith*, 19-cr-40091, Criminal Complaint. Mr. Smith was a member of the Nazi extremist group Feuerkrieg, which advocates for a race war. Additionally, Mr. Smith provided an undercover FBI agent with information about making explosives and asserted his intent to use them. Mr. Smith also spoke to others about traveling to Ukraine to fight with a "violent, far-right paramilitary group." Ultimately, Mr. Smith pled guilty to Distribution of Information Related to Explosives in violation of 18 U.S.C. §842(p)(2)(A) and was sentenced to 30 months imprisonment.

In *United States v. Bruce-Umbaugh*, 19-cr-0130 (N.D. Texas), the defendant was caught in his vehicle wearing combat gear with an AR-15 rifle, AK-47, semi-automatic rifle, and more than 1,500 rounds of ammunition in vehicle. The defendant was a member of Attowaffen, considered to be the most violent and dangerous Neo-Nazi group in the United States. Mr. Bruce-Umbaugh had even traveled to Germany with other Attomwaffen members and took photos glorifying Auschwitz. Ultimately, Mr. Bruce-Umbaugh was sentenced under 18 U.S.C.

§922(g)(3) for possession of firearms and ammunition as a prohibited person, based on his prior conviction for controlled substances. Mr. Bruce-Umbaugh was sentenced to 30 months imprisonment.

In all of these cases and many additional cases cited in Exhibit 1, defendants received sentences ranging from time served up to 44 months of imprisonment. These cases are the most comparable to Mr. Mathews. The big difference in the current case, is the extreme breadth of the investigation, involving a 24-7 wiretap within the home that could capture even the slightest inkling of an idea to be transcribed in the government's sentencing memorandum. If anything, the constant level of surveillance revealing nothing of substance proves that Mr. Mathews was far less dangerous than someone like Mr. Bruce-Umbaugh, for example. In that case, police officers randomly stumbled upon a full-fledged Nazi in tactical gear, armed to the teeth in his vehicle, with no idea what he had been planning for prior months. One could extrapolate that if Mr. Bruce-Umbaugh had been subjected to a similar level of surveillance as Mr. Mathews, the intercepted communications would have revealed similarly extreme hate speech and likely some actual steps towards a criminal act, which did not exist in the current case.

   b. *More Severe Cases.*

Exhibit 1 also includes examples of more extreme cases, which portrays the disproportionate nature of the government's 25-year recommendation. *See* ex. 1, at 18. In almost all of these cases, the U.S.S.G. § 3A1.4 terrorism enhancement was neither recommended by the government nor implemented.

The one case involving the terrorism enhancement, *United States v. Reznicek*, 19-cr-0172 (S.D. Iowa) involved a defendant who plead guilty to Conspiracy to Damage an Energy Facility,

in violation on 18 U.S.C. § 1366(a). In this case, the defendant destroyed equipment and infrastructure associated with the Dakota Access Pipeline and made public statements encouraging others to participate in more destruction. The government argued that the statements coupled with the actions were calculated to influence or affect the conduct of government by intimidation. *Reznicek*, 19-cr-0172, ECF. No. 130, at 2. Incorporation of the 12-point terrorism enhancement would have resulted in a Guidelines Range of 210-240 months' imprisonment, based on the defendant's criminal history category VI. *Id.* Ultimately, the government recommended a 180-month sentence and the defendant received a 96-month sentence.

Another example where the government sought the terrorism enhancement was *United States v. Pitts*, 19-cr-0035 (N.D. Ohio). In this case, the defendant expressed interest in joining al-Qaeda and training to conduct an attack within the United States. He made detailed plans to commit a Fourth of July terrorist attack with an undercover agent and planned to travel to Philadelphia to detonate a truck bombing on federal buildings. *Id.*, ECF No.1. Mr. Pitts pled guilty for (1) Attempting To Provide Material Support Or Resources To A Foreign Terrorist Organization, in violation of 18 U.S.C. § 2339B(a)(1); (2) Threats Against The President Of The United States, in violation of 18 U.S.C.§ 871(a); and (3) Threats Against Immediate Family Members Of The President Of The United States, in violation of 18 U.S.C. § 879(a)(2). Mr. Pitts received a sentence of 168 months.

Most recently, in *United States v. Fox*, 20-cr-00183 (W.D. Michigan), six coconspirators engaged in a detailed conspiracy to kidnap the governor of Michigan. This conspiracy spanned from June 6, 2020 through October 7, 2020 and involved 19 overt acts named in the indictment, directed at the plot to kidnap the governor. *Fox*, 20-cr-00183, ECF No. 86 at 3-4. One of the

defendants, Ty Garbin pled guilty to Kidnaping Conspiracy, in violation of 18 U.S.C. § 1201(c) and received a sentence of 75 months. *Id*., ECF No. 142; 300. The case against the other defendants is still pending.

There is simply no justification for the government's 300 month sentencing recommendation against Mr. Mathews. It is grossly disproportionate, even when compared to sentences received where the terrorism enhancement was actually justified. Clearly, Mr. Mathews' conduct aligns with the prior group of cases and he should be sentenced based on his actual conduct.

### c. *The January 6, 2021 Capital Breach Cases.*

Finally, the rise of recent political extremism was evidenced by the January 6, 2021 United States Capitol riots, which resulted in a flurry of cases. See Capitol Breach Cases, United States Attorney's Office District of Columbia, https://www.justice.gov/usao-dc/capitol-breach-cases; ex. 1, at 11. Even the most severe of these cases, where actual violent acts occurred, have not resulted in sentences over one year of imprisonment. The plea agreements in the pending cases indicate we will not see a sentence of that magnitude for any of the Capitol Breach cases.

The Justice Department as well as the courts have come to understand that in times of political discord, ordinarily law-abiding citizens may act out in an unusual manner. Over punishing law-abiding citizens serves no public interest and tends to exacerbate existing political and social tensions. By sentencing such defendants to jail time, without tearing their lives apart with excessive punishment, the government has effectively deterred future conduct, while also deterring future division within the country by allowing these people to heal and resume their ordinary lives.

While Mr. Mathews' and Mr. Lemley's involvement with the Base was different from many of the people storming the Capitol, neither defendant ever acted violently or incited others to commit violent acts. Their thoughts and ideas were confined to private conversations. Similar to many of the Capitol Breach defendants, Mr. Mathews and Mr. Lemley were law-abiding citizens prior to the instant offense and served in their country's militaries. They deserve a second chance to return to their families and resume their lives, as society continues to heal from the political tension and division that ensued during the Trump presidency. The government's recommended sentence serves no purpose than to utterly destroy the defendants' lives. A sentence of 33 months imprisonment is more than sufficient to deter the defendants and easily proportionate to other cases, involving similar conduct.

## V.      REQUEST TO ADOPT ARGUMENTS OF THE CODEFENDANT.

Mr. Mathews seeks to join in and adopt all arguments set forth by his codefendant, Brian Lemley, which may be relevant to Mr. Mathews' sentencing to the extent that they are not inconsistent with the interests of Mr. Mathews.

## CONCLUSION

For all the reasons stated herein, counsel recommends a sentence of 33 months imprisonment.

Respectfully submitted,


/S/
_____

JOSEPH A. BALTER          #04496
Law Office of Joseph A. Balter, LLC
Mt. Washington Mill
1340 Smith Avenue, Ste 200
Baltimore, Maryland 21201
Telephone:   (410) 375-7082
Facsimile:   (410) 779-1201
Email:          joseph@josephbalterlaw.com