IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO. TDC-20-33 |
| | * | CRIMINAL NO. TDC-21-205 |
| BRIAN MARK LEMLEY, JR., and | * | CRIMINAL NO. TDC-21-206 |
| PATRIK JORDAN MATHEWS, | * | |
| | * | |
| Defendants | * | |
| | * | |

********

## GOVERNMENT'S RESPONSE TO DEFENSE SENTENCING MEMORANDA

The defendants ask for a leniency they never contemplated showing those they intended to murder, terrorize, and humiliate. Their unreasonable sentencing recommendations are untethered to the facts, inconsistent with the Sentencing Guidelines, and contrary to the § 3553(a) statutory sentencing factors. Instead, a 25-year term of incarceration is appropriate for each defendant.

**I.      The First Amendment Cannot Save The Defendants From Their Own Words.**

The defendants claim that their statements, while "undeniably troubling," are protected by the First Amendment and off-limits to use in any sentencing proceeding. ECF No. 177 at 18-20 ("Yet considering Mr. Lemley's beliefs at sentencing would violate the First Amendment."); ECF No. 175 at 16 ("[Mathews's] beliefs, opinions, and advocacy of controversial or unpopular political positions are protected speech under the First Amendment to the United States Constitution."). The defendants are wrong.

The First Amendment has nothing to do with this case. Speech and written words can prove intent and rationale behind criminal plans. *See, e.g.*, Sand, Modern Jury Instructions, 6-17 (knowledge, willfulness, and intent may be inferred from what a defendant says). The defendants do not challenge the validity of any of the criminal statutes underlying their convictions as violative of the First Amendment; they only challenge whether their words can be used against them in

order to prove criminal conduct and intent. They can be. *See Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993) ("The First Amendment, moreover, does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent. Evidence of a defendant's previous declarations or statements is commonly admitted in criminal trials subject to evidentiary rules dealing with relevancy, reliability, and the like."); Fed. R. Evid. 801.

Even the cases cited by the defendants are contrary to their argument. Those precedential cases repeatedly stand for the proposition that words and views can be used as relevant sentencing considerations if they bear on the issues at hand. *See Dawson v. Delaware*, 503 U.S. 159, 166 (1992) ("In many cases, for example, associational evidence might serve a legitimate purpose in showing that a defendant represents a future danger to society. A defendant's membership in an organization that endorses the killing of any identifiable group, for example, might be relevant to a jury's inquiry into whether the defendant will be dangerous in the future. Other evidence concerning a defendant's associations might be relevant in proving other aggravating circumstances.");[1] *United States v. Schmidt*, 930 F3d 858, 859 (7th Cir. 2019) (finding permissible the sentencing court's use of the defendant's white supremacist beliefs in fashioning an appropriate sentence in a § 922(g) case, as evidence of "likelihood of future dangerousness and his lack of

---

[1] The defendants both cite *United States v. Runyon*, 707 F.3d 475, 494 (4th Cir. 2013), but that case merely reiterates what the Supreme Court said in *Duncan*, which is unhelpful to the defendants' argument. Moreover, *Runyon* is inapposite on the facts. There, the defendant was convicted and sentenced to death. During a custodial interrogation, which was played to the sentencing jury, law enforcement implored the defendant to lean on his Christian faith and repent his sins—that is, confess to the murders. The Fourth Circuit found that references to the defendant's religion were not "germane to the question of what sentence he should receive . . . . There is no indication that the killing was motivated by or connected to Runyon's Christianity at all, and the discussion of his religion did not serve to rebut any mitigating evidence offered by the defense." *Id.* The Fourth Circuit further took evidentiary issue with admission of the tape since the statements were made by law enforcement, not by the defendant. Ultimately, the Fourth Circuit determined that introduction of the tape was harmless error. *Id.* at 498.

respect for the law"); *United States v. Alvarez-Nunez*, 828 F.3d 52, 55-56, 58 (1st Cir. 2016) (vacating sentence where the sentencing court considered artistic expression untethered to any relevant sentencing factor, but noting that "protected conduct may be relevant in a multiplicity of ways. For instance, it may legitimately be used to rebut mitigating evidence proffered by the defendant. So, too, it may be used to evaluate the degree of the defendant's remorse, the likelihood of reoffending, or the extent of punishment needed for deterrence." (citations omitted)).

Implicitly acknowledging that the caselaw is unfavorable to their position, the defendants then claim—against all evidence to the contrary—that "allegations related to viewpoints and beliefs purportedly held and expressed by Mr. Mathews and other members of the Base . . . do not relate to the criminal conduct of which he has been convicted." ECF No. 175 at 22-23. This statement is false, and inconsistent with federal law. *See* 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."). The defendants' beliefs and intentions—their desire to subjugate and kill minorities, to violently establish a white nation, to demote women to a lesser class—were the sole bases, or at least the primary bases, for committing their crimes of conviction, and are the reasons the defendants intended to promote federal crimes of terrorism.

The defendants were not prosecuted in order to abridge their free-speech rights, nor is the Government seeking a substantial term of incarceration for those reasons. Rather, the defendants are being called to account for their long-standing motives and intentions (and the crimes they committed arising from those motives), which bear on the Sentencing Guidelines and statutory sentencing factors. What the defendants call "beliefs" and "views" are really their "intentions." And intentions matter.

**II.     The Defendants Intended Their Actions to Promote Federal Crimes of Terrorism.**

The defendants focus on the undisputed, and irrelevant, fact that their crimes of conviction were "non-violent." ECF No. 177 at 1; ECF No. 175 at 1.[2] They claim that they "did not ***plan*** to ***initiate*** violent action." ECF No. 177 at 1 (emphasis added).[3] Only a cabined interpretation of the meaning of "plan" and "initiate," a misunderstanding of the applicable caselaw, and the closing of one's eyes to all of the surrounding circumstances, could lead the defendants to this argument.

The defendants repeatedly claim that they had no "plan." ECF No. 177 at 19; ECF No. 175 at 4 ("The intercepts revealed countless rambling conversations unhinged to any actual plan."). As a legal matter, whether the defendants had a plan is of no moment to determining whether the § 3A1.4 terrorism enhancement applies. Rather, it is the defendants' ***intentions*** that matter, not their wherewithal. All that is required is that the crimes of conviction (or relevant conduct) involved or were *intended to promote* a federal crime of terrorism—not that the defendants actually had a plan or the capacity to succeed. *See United States v. Mandhai*, 375 F.3d 1243, 1248 (11th Cir. 2004) ("Contrary to Mandhai's assertion, the terrorism enhancement does not hinge upon a defendant's ability to carry out specific terrorist crimes or the degree of separation from their actual implementation. Rather, it is the defendant's purpose that is relevant, and if that purpose is to promote a terrorism crime, the enhancement is triggered . . . The enhancement was proper even though the record reflects that Mandhai lacked both the means and the ability to carry out his defined activity without assistance that was not present"); *United States v. Elshinawy*, 2018 WL

---

[2] As the Court previously noted with respect to co-defendant Bilbrough, "these charges do not involve crimes of violence…. However, the circumstances of these charges are more troubling." ECF No. 92 at 4-5.

[3] *See also* ECF No. 177 at 15 ("[T]hey had not in fact formulated or prepared to act on any plans to initiate violent action, in Virginia or elsewhere."); *id.* at 20 ("[T]here was no plan to initiate violence.").

1521876 (D. Md. Mar. 28, 2018) (quoting *Mandhai* for proposition that Government need not "prove that the defendant had the means or ability to implement his plans" and that the defendant's purpose is the relevant consideration), *aff'd*, 781 F. App'x 168 (4th Cir. 2019).

Moreover, as a factual matter, the defendants are incorrect that they had no "plan." The defendants had plans, both general and specific, with very specific desired outcomes. The Government's opening sentencing memorandum described these plans in detail, with documentary support.[4] Most pressing in terms of timing and urgency was the defendants' plans for the Battle of Richmond—first, to assess violence in and around Richmond in January 2020 and then, if possible, to contribute to it. Though the defendants claim that the Government "cannot point to any real steps taken by these men towards carrying out any violent act they discussed in the abstract," such an argument elides the facts. Everything the defendants admitted to in their Statement of Facts stands in contrast to their late argument. Mathews didn't illegally cross the border on a whim. Lemley didn't ferry Mathews throughout the country out of some misguided sense of altruism. Lemley and Mathews didn't assemble an assault rifle out of the goodness of their hearts. The guns they possessed weren't for sport or collecting.[5] Lemley could have walked into any federal firearms licensee and legally purchased any firearm; instead, he chose to help an alien construct one that could not be traced. Lemley didn't buy more than 3,000 rounds of ammunition (*see* ECF No. 159 a 17-18) just to have it; he bought it to use it, some of which he and

---

[4] The defendants describe the audio and video intercepts as just "rambling, disorganized, profane exchanges among men who are trying to impress one another and are frequently engaged in petty squabbling." ECF No. 177 at 18. *See also* ECF No. 175 at 4 ("The intercepts revealed countless rambling conversations unhinged to any actual plan."). The Court should not countenance the defendants attempt to use, effectively, a "locker-room talk" argument.

[5] The defendants claim that they were merely engaged in "recreational shooting" when they went to the Maryland gun range. ECF No. 175 at 5. The shooting was not recreational—it was preparatory.

Mathews did during training. The defendants didn't travel to different states for casual banter; they did so to train in military and para-military tactics with like-minded confederates. Lemley didn't buy a large antenna for his truck just to impress at a local car show; he bought it with a specific purpose in mind, to better stay in touch during the Boogaloo.

In sum, the defendants had plans and intentions, and acted on them.

### III. The Defendants' Underlying Trauma and Conditions Do Not Excuse Their Conduct.

Consistent with the caliber of the defense attorneys here, the defense sentencing memos do an expert job trying to humanize the defendants—to paint full portraits of damaged individual lives and loving extended families—instead of focusing on the criminal conduct that brought the defendants before the Court. However, while it certainly would be human to empathize and sympathize with the defendants' pasts, at the same time the defendant's history and characteristics do not excuse or even mitigate their conduct. And in some respects, the defendants' history and characteristics actually militate in favor of a lengthier term of incarceration.

#### A. **Lemley**

At the same time, however, those arguments are in some ways contrary to other known facts, and in other ways cut against the request for a short term of incarceration.

The intended effect is to attempt to put into context his current criminal conduct.

he joined the military and by all accounts served admirably.[6] He led a stable enough life to generate relationships, a child, and at least one steady job—at the same time he committed his criminal conduct. *See, e.g.*, ECF No. 177 at 11 ("He excelled at the job and it paid reasonably well, allowing him to get his own apartment, support his son, and have some disposable income.").

---

[6] Notwithstanding his honorable service, Lemley betrayed his country, and the ideals for which he served, by virtue of his criminal conduct.



In some respects, Lemley's position supports a *lengthy* term of imprisonment based on specific deterrence required by § 3553(a)(2)(B) and the need to protect the public required by § 3553(a)(2)(C). Lemley, for years, rejected any safety net of family or friends. In turn, because of the defendant's conduct, his friends and family appear to have purposefully chosen not to engage him in his time of need. ECF No. 177, Ex. 10 at 1 ("The signs that [Lemley] was in crisis were all around us but we did not make the right choices to protect him."); ECF No. 177, Ex. 5 at 3 ("It is true that I wish we had been able to find the right words sooner."); ECF No. 177, Ex. 6 at 1 ("I can see in hindsight how he lost his way."); ECF No. 177, Ex. 6 at 3 ("We as a family did not realize the seriousness of Mark's involvement. We agreed that if we did not join in by listening to this it

would go the way of all the other hobby type things . . . ."); ECF No. 177, Ex. 7, at 2 ("We did not see it all before, but we see it all now, and we are ready to take care of him."); ECF No. 177, Ex. 11 at 1 ("I realize now he was desperate to be accepted."). There is little reason to believe that the defendant would receive, or avail himself of, any help now.[9] The Court can trust prison walls to deter him and to protect the public; unfortunately, the Court cannot trust Lemley to lean on his family's heretofore non-existent support network.[10]

### B. Mathews

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ By Mathews's own account, he "comes from a stable and loving family." ECF No. 175 at 2. ▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

---

[9] Various statements by Lemley's family members to the contrary offer blind hope instead of reasoned conclusions. ECF No. 177 at 9 ("My family would never make this mistake again, and Mark would never make these mistakes again."); ECF No. 177 at 11 ("Ultimately though in all of my delirium I knew that I didn't want to hurt anyone, and this is something that I know to be true about Mark."). Same for Mathews. ECF No. 175 at 7 ("I think it is very unlikely that he would ever break the law in the future.").

[10] In an odd confluence of events, another domestic terrorism prosecution was happening in the District of Maryland while the defendants committed their criminal conduct. In *United States v. Hasson*, GJH-19-96, Hasson (a Coast Guard Lieutenant) was charged with firearms and narcotics offenses, but also was accused of being a white supremacist and domestic terrorist. During early November 2019, in an encrypted chatroom, certain members of The Base—including its leader and Lemley—took note of law enforcement's crackdown on racially motivated violent extremists, **including Hasson**. *See Hasson*, GJH-19-96, ECF No. 115-1 at 18-23. Yet Lemley continued his criminal conduct for months until his arrest; he was not even deterred by a similarly-minded individual facing federal prosecution.

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▆▆▆▆▆▆▆▆▆▆▆▆ did not prevent him from doing well in school. ECF No. 175 at 11-12. Or serving in the Canadian military. *Id.* at 12. Or holding steady jobs and having a "strong work ethic." ECF No. 175 at 12.

▆▆▆▆▆▆▆▆▆▆▆▆ including hiding his true intentions from those around them. Only by doing this could Mathews be described as a great worker on a diverse construction crew while simultaneously building an assault rifle with the intent to kill minorities in a race war. Mathews even said that he daily thought about what he would do to his co-workers if they found out the truth about him. *See* **Exhibit 31**; **Exhibit 31a** ("I think daily about what I'm going to do with my coworkers if they figure out who I am…and how I'm going to respond"). White nationalists like Mathews survive by hiding in public.

Mathews's arguments also do not give comfort that he will be specifically deterred or that a light prison sentence will protect the public. ▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆

And the Court cannot take comfort that Mathews would ▆▆▆▆▆▆▆▆▆▆▆▆ or avail himself of a network of family and friends who already turned a blind eye to, or simply did not understand, his past conduct. *See* ECF No. 175, Ex. 5 at 1 ("I wish I had spoken with Pat about

---

▆▆▆▆▆▆▆▆▆▆▆▆

all of this more before he went off and ran away to his Base friends . . . ."); *id.* at 6 ("I was truly surprised and just in shock."); *id.* at 12 ("I was shocked to hear about the group he had joined."); ECF No. 175 at 13 ("I was actually kind of happy that he found some people that he was getting along with and could hang out with.").

### IV. The Defendants Request An Unwarranted Sentencing Disparity.

The defendants both seek 33-month terms of incarceration—sentences at the low end of a Guideline range that does not account for any of the enhancements proposed by the Government, including the § 3A1.4 terrorism enhancement. In so doing, the defendants seek an unwarranted sentencing disparity.

#### A. Co-Defendant Bilbrough

The defendants try to make the case that their indicted co-defendant, William Garfield Bilbrough IV, received an overly harsh sentence. ECF No. 177 at 22 ("The sentence co-defendant William Bilbrough negotiated with the government should not be used as a reference point for Mr. Lemley's sentence."). It strains credulity for the defendants even to make this argument. As the Government has elsewhere said, Bilbrough was the least culpable defendant in the indictment. He did not construct an assault rifle out of component pieces. He did not intend to participate in the Battle of Richmond. He withdrew from The Base (though he continued to consort with the defendants and others) and sought to travel overseas to foment civil war elsewhere, but was stymied by his grandmother taking his passport. He was 19 years old at the time of his criminal conduct, had Type I diabetes (a clear COVID comorbidity, at a time when that comorbidity, coupled with the outbreak of COVID within the Bureau of Prisons, posed a greater risk to physical safety), and had no prior criminal history. He agreed to, and the Court accepted, a 60-month c-plea. It is brazen for the defendants now to suggest that the Court was wrong. ECF No. 177 at 22

("That sentence . . . was overly harsh."). If the defendants have their way, they will be enjoying barbecues with their families in the summer of 2022 while Bilbrough remains in federal prison.

### B. Four Other Inapposite Cases

The defendants ask the Court to consider sentences in four other cases, none of which are particularly relevant here. First, the defendants focus on *United States v. Tobin* out of the District of New Jersey. ECF No. 177 at 22-23. Tobin was a member of The Base, charged federally in New Jersey for conspiring to violate civil rights by defacing two synagogues with spray paint. Tobin was not charged with any of the offenses with which the defendants were charged, nor did he stand accused of intending to promote federal crimes of terrorism. The facts of Tobin's case that are provided by the defendants are different than the facts here. The defendants also do not identify other relevant sentencing factors, the details of Tobin's PSR, or whether Tobin cooperated with law enforcement.[12] Accordingly, the defendants do not provide the Court with sufficient information to make an assessment regarding an unwarranted disparity with a similarly-situated defendant.

Second, and similarly, the defendants draw the Court's attention to *United States v. Barasneh* out of the Eastern District of Wisconsin. ECF No. 177 at 23-24. Barasneh, also a member of The Base, conspired with Tobin to deface the two synagogues, and was charged with conspiracy to violate civil rights. Barasneh was not charged with any of the offenses with which the defendants were charged, nor did he stand accused of intending to promote federal crimes of

---

[12] The Statement of Facts in Tobin's case, when compared against the affidavit in support of Barasneh's criminal complaint, makes clear that Tobin gave incriminating statements that were used by law enforcement in charging Barasneh. Moreover, the defendants knew and discussed that Tobin had been arrested in November 2019. Yet that knowledge did not stop them from continuing for months the conduct that led to being charged themselves in January 2020, which should give the Court pause that the defendant's are likely to be specifically deterred with a short sentence.

terrorism. The facts of Barasneh's case that are provided by the defendants are different than the facts here. The defendants also do not identify other relevant sentencing factors, the details of Barasneh's PSR, or whether Barasneh cooperated with law enforcement. Again, the defendants fail to explain how Barasneh's sentence, for different conduct, yields an unwarranted disparity here.

Third, the defendants direct the Court to *United States v. Zamudio* out of the Southern District of California in 2021. ECF No. 175 at 23-24. Zamudio was convicted of Title 26 offenses for possessing unregistered firearms. As far as the Government can glean from the limited information provided by the defense, Zamudio was a racist. That about ends the similarities between Zamudio and the defendants. Zamudio was not charged with any of the offenses with which the defendants were charged, nor did he stand accused of intending to promote federal crimes of terrorism.

Fourth, the defendants rely on *United States v. Griggers* out of the Middle District of Georgia in 2021. ECF No. 175 at 24-25. Griggers also was charged with Title 26 offenses for possessing unregistered firearms, and was in contact with Zamudio. Griggers also was racist. Again, that appears to be the lone similarity with the defendants. Griggers was not charged with any of the offenses with which the defendants were charged, nor did he stand accused of intending to promote federal crimes of terrorism.

The defendants' selected comparators do not involve the conduct the Government outlined throughout this case, including in its extensive opening sentencing memorandum. Thus, those cases are not valuable in assessing whether a 25-year term of imprisonment represents an ***unwarranted*** sentencing disparity among defendants with similar records who have been found guilty of similar conduct.

## Conclusion

For the reasons set forth above, and in the Government's opening sentencing memorandum, the Government respectfully requests that the Court impose a term of imprisonment of 25 years as to each defendant.

Respectfully submitted,

Erek L. Barron
United States Attorney

/s/
Thomas P. Windom
Thomas M. Sullivan
Assistant United States Attorneys